STATE of Minnesota, Respondent,

v.

Paula Michele WILLIAMS,
Petitioner, Appellant.

No. C4–93–437.

Supreme Court of Minnesota.

Dec. 23, 1994.

Rehearing Denied Feb. 10, 1995.

John M. Stuart, State Public Defender, Scott G. Swanson, Asst. Public Defender, Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., and Tom Foley, Ramsey County Atty., Steven C. DeCoster, Darrell C. Hill, Asst. Ramsey County Attys., St. Paul, for respondent.

## OPINION

COYNE, Justice.

Defendant, Paula Michele Williams, was found guilty by a district court jury of first-degree controlled substance offense (possession of more than 10 grams of cocaine with intent to sell), Minn.Stat. § 152.021, subd. 1(1) (1992). She was sentenced by the trial court to an executed term of 81 months in prison, the low end of the presumptive sentence range of 81–91 months for the offense, a severity level VIII offense, when committed by a person with a criminal history score of zero.[1] The court of appeals affirmed defendant's conviction against claims that (1) her convictions should be reversed outright because the evidence that she *consciously* possessed the cocaine was insufficient; (2) she should be given a new trial because (a) the jury that found her guilty was drawn from a pool that failed to satisfy the Sixth Amendment requirement that the jury represent a fair cross-section of the community and (b) the trial court committed plain error of a prejudicial nature in failing to exclude *sua sponte* the state's evidence that defendant fit a so-called "drug courier profile"; and (3) at a minimum, her 81–month executed prison sentence should be modified to a stayed sentence because, as a 37–year–old first offender, she is particularly amenable to rehabilitation or treatment in a probationary setting and it was an abuse of discretion for the trial court to deny her request for probation. *State v. Williams*, 510 N.W.2d 252 (Minn.App.1994). We agree with the court of appeals' conclusion that the evidence was sufficient to support the jury's verdict. However, a review of the record convinces us that defendant is entitled to receive a new trial because the prosecutor, in our opinion, committed plain error in eliciting certain hearsay evidence, in eliciting the drug courier profile evidence, and in closing argument, and we are of the opinion that the cumulative effect of these errors was to deprive defendant of a fair trial.

Late on the evening of Friday, October 2, 1992, defendant arrived at the Amtrak railroad station in St. Paul after a trip which commenced that morning in Detroit, where she lived. Two plain clothes officers approached defendant after she emerged from the last car of the train and after she began walking, alongside other people, toward the train terminal. One of these officers was Jerry Joel ("J.J.") Kramer, an experienced DEA (Drug Enforcement Administration) agent who works out of an office at the Minneapolis–St. Paul International Airport. The other officer was Jo Ann Edblom, a narcotics investigator who is employed at the airport police department and who works with Kramer.

Kramer and Edblom identified themselves to defendant, displayed their badges, told her she was not under arrest and was free to leave, and asked her if they could speak with her for a few minutes. Defendant agreed and, when asked, displayed a photographic identification card with her name on it. Kramer told her that he was looking for a suspect who might be bringing drugs into the Twin Cities, said he did not have a search warrant but asked her if she would consent to a search of her purse. Defendant then handed her purse to Edblom, who searched it without finding any drugs. Defendant was then asked if she would consent to a search of her carry-on bag, and she said yes. A St. Paul police officer who was backing up Edblom and Kramer then directed a police dog, which was trained in detecting the odor of narcotics, to sniff the bag. The dog did so and "mauled" the bag, indicating that it contained drugs. Edblom then opened the bag and, inside one of a pair of socks, found a number of pieces of crack cocaine having a combined weight of approximately 125

---

1. Defendant was also found guilty, on the same evidence, of importing into Minnesota across the state border more than 25 grams of cocaine, Minn.Stat. § 152.0261, subd. 1, but was not sentenced for that offense.

grams, which had an estimated street value in excess of $20,000.

■ A St. Paul police officer custodially interrogated defendant at the jail after her arrest. The interrogation was not recorded.[2] Defendant admitted the carry-on bag was hers but, as she later did in her testimony at trial, denied that the crack was hers or that she had put it in the bag or that she had given anyone permission to do so.

Defendant, who is African–American, challenged the jury venire by pretrial motion, asserting that African–Americans were underrepresented on the venire in violation of her Sixth Amendment right to a jury representing a fair cross-section of the community. Specifically, she claimed that the underrepresentation was significant and was the result of systematic exclusion of African–Americans on jury venires in Ramsey County, as demonstrated by juror statistics kept in Ramsey County since 1990. The trial court denied defendant's motion.

State's evidence against defendant at trial included:

(a) Testimony concerning the objective facts relating to defendant's arrival on the train and the discovery of the crack cocaine in her carry-on bag.

(b) Testimony regarding defendant's statements to the police relating to (i) the reason she was traveling to Minnesota and (ii) the circumstances of the trip.

(c) Testimony that the officers were at the train station looking for defendant because of a "tip" that Kramer had received earlier that day from a police officer in Detroit.

(d) Testimony relating the contents of the tip, including information relating to defendant's arrival at the train station in Detroit that morning, her appearance, the circumstances relating to her purchase of a ticket, information that defendant was carrying cocaine, and information that defendant was traveling to Minneapolis–St. Paul via Chicago.

(e) Testimony about the so-called "drug courier profile" used by drug investigators at airports, train stations and bus terminals to help spot drug couriers.

(f) Testimony describing how defendant's conduct both in Detroit that morning as well as on her arrival at the Amtrak terminal in St. Paul that evening fit the profile.

The jury retired to deliberate at 11:10 a.m. and returned with the verdict at 9:50 p.m. that same day. The presumptive sentence, as we indicated earlier, was an executed term of 86 (81–91) months in prison. The probation agent who prepared the presentence investigation report recommended to the trial court that it depart dispositionally and place defendant on probation on the ground that defendant is particularly amenable to treatment or rehabilitation in a probationary setting. The trial court, as we said, sentenced defendant to 81 months in prison, the low end of the presumptive sentence duration, and refused to depart dispositionally.

1. At oral argument in this court the parties focused their attention upon the question whether the trial court erred in denying defendant's pretrial challenge to the jury venire on Sixth Amendment grounds.

By order of this court Ramsey County has retained data on the racial composition of jury pools since August 1, 1990. The jury manager for Ramsey County testified that pursuant to Rule 806 of the Minnesota General Rules of Practice (Jury Management Rules), Ramsey County compiles a master source list of eligible jurors. That list is generated by collecting names from voter registration lists and from lists issued by the Department of Public Safety of all licensed drivers and all individuals who are issued Minnesota state identification cards. By law, there is no racial indicator in any of these lists. Ramsey County has used this system of compiling master source lists of persons eligible for jury duty for approximately 10 years. Since August of 1990, all counties in

---

2. In *State v. Scales*, 518 N.W.2d 587, 588 (Minn. 1994), we held that "[a]ll custodial interrogation including any information about rights, any waiver of those rights, and all questioning shall be electronically recorded where feasible and must be recorded when questioning occurs in a place of detention" (syllabus). Failure to comply with this requirement may result in the suppression of statements made by a suspect in response to the interrogation.

the state are required to use driver's license lists and state identification lists, as well as voter registration lists, to compile their master juror lists. Each week, the jury manager's office estimates the number of jurors required to meet the court's needs, and randomly selects the requisite number of jurors from the master list.

Information on the races of the jurors is obtained through a voluntary self-reporting procedure. When prospective jurors report for service, they fill out a questionnaire which asks them to identify their race as American Indian, Eskimo, Asian/Pacific Islander, Hispanic, African–American, Caucasian, or other. Williams introduced evidence of the racial composition of Ramsey County derived from 1990 census data (African–Americans comprised 3.7% of the population), the racial composition of jury venires since August of 1990 (African–Americans comprised 2% of the jurors in 1990, 2.65% in 1991 and 3% in 1992), and the racial composition of the jury venire for the week of December 7, 1992, when defendant's case was tried (2 of the 102 members of the jury venire were African–Americans). Defendant also introduced weekly summaries of the racial composition of Ramsey County jury venires.

■ The Sixth Amendment does not guarantee a criminal defendant a jury of a particular composition or one that mirrors the community. *Taylor v. Louisiana,* 419 U.S. 522, 538, 95 S.Ct. 692, 701–02, 42 L.Ed.2d 690 (1975); *see State v. Holty,* 307 Minn. 478, 238 N.W.2d 615 (1976) (rejecting a man's challenge to a rape conviction on the ground that the jury that found him guilty was "all female"). In order to establish a prima facie showing that the jury venire from which the petit jury was selected did not satisfy the fair cross-section of the community requirement, a criminal defendant must show that the group allegedly excluded is a "distinctive" group in the community, that the group in question was not fairly represented in the venire, and that the underrepresentation was the result of a "systematic" exclusion of the group in question from the jury selection process. *Duren v. Missouri,* 439 U.S. 357, 364–67, 99 S.Ct. 664,

668–70, 58 L.Ed.2d 579 (1979). If the defendant establishes a prima facie showing of a violation, the government may rebut the showing by establishing that the system used manifestly and primarily advances a significant state interest that is incompatible with the fair cross-section requirement. *Id.* at 367–68, 99 S.Ct. at 670–71.

■ Several of the United States Circuit Courts of Appeal have taken the position that in determining whether the group was not fairly represented in the particular venire from which the particular jury was drawn, one should use a so-called "absolute disparity" test. *Project, Twenty–Third Annual Review of Criminal Procedure: United States Supreme Court and Courts of Appeals 1992–93,* 82 Geo.L.J. 597, 1039 n. 1731 (1994). Assuming the validity of the percentages used by defendant—that African–Americans represent 3.7% of the adult population eligible for jury service in Ramsey County and assuming that African–Americans represent only 2% of the venire from which defendant's jury was chosen—the absolute disparity in this case was 1.7% (3.7% minus 2%). Using this obviously crude statistical approach, United States Circuit Courts have held that absolute disparities of much higher than 1.7% must be established before a defendant makes out a prima facie case.

As defendant points out, in a community in which African–Americans make up only 3.7% of the population, a defendant could never meet the second part of the prima facie test if the absolute disparity approach is used.

We do not read *Duren* in precisely the way many of the Circuit Courts apparently have read it, as necessarily endorsing an absolute disparity approach. In *Duren* the Supreme Court was reviewing a case in which the defendant had shown that women represented 54% of the population eligible for jury service and yet they represented only 15% of the jury venire. The Court did speak of "[s]uch a *gross discrepancy* between the percentage[s]" as a disparity requiring the conclusion that women were not fairly represented in the venire in question, 439 U.S. at 366, 99 S.Ct. at 669–70 (emphasis added), but we do not understand the Court to have meant that in every case one necessarily

subtracts the lesser of the two percentages from the greater to determine the disparity or to measure the fairness of the jury selection process.

In any event, we are unwilling to rely solely upon the "absolute disparity" approach in interpreting the fair cross-section requirement of Article 1, section 6 of the Minnesota Constitution.

On the other hand, we are not persuaded by defendant's advocacy of the "comparative disparity" method as a replacement for the "absolute disparity" method. The comparative disparity method entails dividing the absolute disparity by the population percentage of the cognizable group in the community. *Ramseur v. Beyer*, 983 F.2d 1215, 1231 (3d Cir.1992), *cert. denied*, —— U.S. ——, 113 S.Ct. 2433, 124 L.Ed.2d 653 (1993). It measures the diminished likelihood that members of a cognizable group will be called for jury service in direct proportion to its incidence in the population as a whole. *Id.* at 1231–32; *see also* Kairys, Kadane & Lehoczky, *Jury Representativeness: A Mandate for Multiple Source Lists*, 65 Cal.L.Rev. 776, 790–93 (1977). The United States Supreme Court has recognized but has never expressly adopted the comparative disparity method. *Alexander v. Louisiana*, 405 U.S. 625, 629, 92 S.Ct. 1221, 1224–25, 31 L.Ed.2d 536 (1972).

Defendant in this case established an absolute disparity of 1.7% for African–Americans in the jury venire summoned the week of December 7, 1992. This translates to a comparative disparity of 46%.

The respective percentages of absolute disparity and comparative disparity developed in this case demonstrate with clarity that when the cognizable group in question constitutes a small percentage of the total population of a community, use of the absolute disparity method may distort reality in one direction but use of the comparative disparity method may similarly distort reality in the opposite direction. *United States v. Whitley*, 491 F.2d 1248, 1249 (8th Cir.1974), *cert. denied*, 416 U.S. 990, 94 S.Ct. 2399, 40 L.Ed.2d 769 (1974).

The question whether the group in question was fairly represented in the particular venire from which the petit jury was chosen will not be answered by reliance on one particular statistical tool. Rather, courts should be free to use all the statistical tools available, including the absolute disparity figure, the comparative disparity figure, standard deviations, and any other such tools. Most people who make judgments based on statistical analysis do not rely on just one statistical tool. Someone concerned with averages, for example, will look not just to the mean figure but also to the mode and median figures.

■ In our opinion, the key part of the showing required of a defendant challenging a venire on Sixth Amendment grounds should be that over a significant period of time—panel after panel, month after month—the group of eligible jurors in question has been significantly underrepresented on the panels and that this results from "systematic exclusion," that is, unfair or inadequate selection procedures used by the state rather than, *e.g.*, a higher percentage of "no shows" on the part of people belonging to the group in question. In *Duren*, the defendant established systematic underrepresentation by showing that "a large discrepancy occurred not just occasionally, but in every weekly venire for a period of nearly a year * * *." 439 U.S. at 366, 99 S.Ct. at 669.

■ We agree with the trial court and the court of appeals that the defendant in this case failed to meet the burden of establishing a prima facie case of systematic exclusion of African–Americans. It is true that defendant in this case established that, using comparative disparity analysis, African–Americans had been underrepresented in prior venires in Ramsey County for 3 years in a row, 1990 (46% comparative discrepancy figure), 1991 (28% comparative discrepancy figure) and 1992 (19% comparative discrepancy figure). But defendant's statistics also show that, as the court of appeals noted, "for a number of weeks African Americans were overrepresented in the jury pool, and that in the last two years overall they were not nearly as underrepresented as they were on

the pool from which [defendant's] jury was chosen." 510 N.W.2d at 254.

Defendant argues that the court of appeals in effect has accepted a "less racist" jury. We believe that this characterization is unfair to the court of appeals. Nevertheless, we wish to make it clear that we will not be satisfied until both the reality and the perception of underrepresentation of African-Americans and other distinct minority groups are eliminated. Report of Minnesota Supreme Court, Task Force on Racial Bias in the Judicial System 32–38 (1993) contains a discussion of the various reasons for underrepresentation of certain groups on juries in Minnesota and proposals for insuring that juries in Minnesota become more adequately representative of the eligible population. While the evidence fails to establish systematic exclusion, the evidence—both anecdotal and statistical—indicates that there is some underrepresentation in fact. That the underrepresentation is not the result of systematic exclusion does not justify complacency or satisfaction with the inclusiveness of the system. That the United States Constitution and the Minnesota Constitution require only that underrepresentation not be the result of systematic exclusion does not mean that the system of selection is perfect. We intend to use our supervisory power over the trial courts to insure that the systems used are increasingly inclusive in the hope that the faces of the people in the jury room will soon mirror the faces of the people in the community at large.

2. While our review of the record fails to support defendant's Sixth Amendment attack on the jury venire, that review convinces us that defendant did not receive a fair trial.

■ As Justice Rogosheske said over 30 years ago in *State v. Peterson,* 266 Minn. 77, 83, 123 N.W.2d 177, 182 (1963), and as we echoed most recently in *State v. Post,* 512 N.W.2d 99, 103 (Minn.1994), an appellate court has a "responsibility to review the record even though the assignments of error are inadequate * * *." Justice Kelley put it this way in *State v. Hannuksela,* 452 N.W.2d 668, 673 n. 7 (Minn.1990) (quoting Tate, *Sua Sponte Consideration on Appeal,* in Appel-

late Judicial Opinions 128 (R. Leflar ed. 1974)),

[I]t is the responsibility of appellate courts to decide cases in accordance with law, and that responsibility is not to be "diluted by counsel's oversights, lack of research, failure to specify issues or to cite relevant authorities."

*See also* Allan D. Vestal, *Sua Sponte Consideration in Appellate Review,* 27 Fordham L.Rev. 477, 508–12 (1959).

■ Moreover, while we have often held that by failing to object to a particular trial error a criminal defendant is normally deemed to have forfeited his/her right to have the alleged error reviewed on appeal, we have also adhered to the equally important rule that, notwithstanding the failure to object at trial, a defendant may obtain appellate review of and relief from plain errors affecting substantial rights if those errors had the effect of depriving the defendant of a fair trial. *State v. Shamp,* 427 N.W.2d 228 (Minn.1988). *See also* Minn.R.Crim.P. 31.02.

In this case our review of the record convinces us that the prosecutor committed plain error (a) in eliciting the hearsay evidence about the tip, (b) in eliciting the drug courier profile evidence, and (c) in her closing argument, and that the cumulative effect of these errors was that defendant was deprived of a fair trial.

■ (a) We have said a number of times that "a police officer testifying in a criminal case may not, under the guise of explaining how [the] investigation focused on defendant, relate hearsay statements of others." *State v. Cermak,* 365 N.W.2d 243, 247 (Minn.1985). *See also State v. Hardy,* 354 N.W.2d 21, 24–25 (Minn.1984) ("even a limited elicitation, for nonhearsay purposes, of general testimony that a tip had been received that led to defendant's prints being compared with the latent print would have been unjustified in this case because the potential of the evidence being used for an improper purpose outweighed its very limited probative value").

In this case Officers Edblom and Kramer testified that they and other officers were at the train station waiting for defendant that

night because of a "tip" that Kramer had received earlier that day from a border patrol agent in Detroit that defendant was on the train in question and that she was believed to be working as a drug courier carrying a quantity of crack cocaine. This, of course, was pure hearsay evidence not admissible under any exception to the hearsay rule. Despite the prosecutor's cautioning the jury in her closing statement that the evidence was presented only to explain why the officers were at the train station and why they approached defendant, it is unlikely that the jury did not consider the evidence as substantive evidence of defendant's guilt that corroborated (and was corroborated by) the other evidence presented to establish guilt.

(b) Equally if not more troubling is the prosecutor's elicitation of evidence from the two officers that defendant fit a so-called "drug courier profile."

A "drug courier profile" is "an informally compiled abstract of characteristics thought typical of persons carrying illicit drugs." *United States v. Mendenhall,* 446 U.S. 544, 547 n. 1, 100 S.Ct. 1870, 1873 n. 1, 64 L.Ed.2d 497 (1980).

Drug courier profiles are typically used by DEA agents and police officers stationed at airports, train depots and bus terminals who are looking for arriving and departing passengers who may be acting as couriers in the interstate transportation of illicit drugs.

[These agents] observe arriving and departing travelers * * *. They watch for "characteristics and behavioral traits which, on the basis of their collective experience, have tended to distinguish drug couriers from other passengers." When a specific traveler arouses the agents' suspicions, they approach the suspect, identify themselves, ask the suspect to consent to questioning, and ask to see the suspect's identification and ticket. If the agents' suspicions are not eliminated during this exchange, they continue to question the suspect and ask him to move to another location within the airport, often a room used by law enforcement officers. The suspect is typically asked at this point to consent to a search of his person, luggage, or both. If the suspect voluntarily consents to the police requests at any stage of the transaction, the police are free to continue the investigation. If the suspect does not consent and attempts to depart, the police must either allow him to proceed on his way or seize him.

The drug courier profile comes into play in two ways in this police-citizen transaction. Initially, it may trigger investigative action by arousing the agents' suspicions about a particular traveler. Agents allegedly rely on the profile to identify potential drug couriers. In addition, the drug courier profile is a factor the police consider in deciding whether to seize a suspect.

Morgan Cloud, *Search and Seizure by the Numbers: The Drug Courier Profile and Judicial Review of Investigative Formulas,* 65 B.U.L.Rev. 843, 848–49 (1985) (footnotes omitted). *See also* Charles L. Becton, *The Drug Courier Profile: "All Seems Infected That th' Infected Spy, As All Looks Yellow to the Jaundic'd Eye,"* 65 N.C.L.Rev. 417 (1987).

There is no uniform national profile:

Not only does each airport have a profile, but a single DEA agent may use multiple profiles of his or her own. Paul Markonni, the person most often credited with developing the drug courier profile, and clearly the agent most often listed in drug courier profile cases, has articulated several slightly varying profiles in reported cases. One court has used different profiles for incoming and outgoing flights. The United States Court of Appeals for the Ninth Circuit in *United States v. Patino,* [649 F.2d 724, 725 (9th Cir.1981)] made reference to a "female" drug courier profile. The United States Court of Appeals for the Fifth Circuit referred to a regional profile in *United States v. Berry,* [670 F.2d 583, 598–99 (5th Cir.1982)] and a profile associated with particular agents in *United States v. Elmore* [595 F.2d 1036, 1039 n. 3 (5th Cir.1979), *cert. denied,* 447 U.S. 910, 100 S.Ct. 2998, 64 L.Ed.2d 861 (1979)]. And, contributing to the proliferation of the drug courier profile, state and

local law enforcement agencies have instituted their own profile programs.

Becton, *supra* at 433–34 (footnotes omitted).

One commentator presents a list of often-cited factors categorized under topic headings, pointing out some of the internal inconsistencies:

### 1. Reservations and Ticket Purchases

In many cases drug agents testify without hesitation that drug couriers seldom make reservations, and that couriers instead prefer to purchase their airline tickets immediately before flight departure time. With no less resolve drug agents testify also that drug couriers often make recent or short-notice reservations. They also testify that a passenger's use of bogus or false telephone call-back numbers when making reservations is as significant as a passenger's failure to give any call-back number to the airline. Similarly, while DEA agents accept as profile factors the purchase of round-trip tickets and the purchase of one-way tickets, they treat with equal significance "paying for an airline ticket in currency of small denominations" and purchasing a ticket with large denominations of cash. Furthermore, the testimony of DEA agents indicates that the purchase of a "coach" ticket may be as salient a profile factor as the purchase of a "first-class" ticket.

### 2. Airports and Flights

When DEA agents first developed the drug courier profile, the "source city" designation became a preeminent profile factor. Drug agents routinely monitored incoming flights from source cities. When it became necessary, however, drug agents testified not only about the relevance of source cities but also about the significance of use cities, transshipment cities, hub cities, and cross-road cities. And, as expected, "outgoing flights" have become as important as "incoming flights." A greater inconsistency surfaces, however, when DEA agents testify about frequent, short turn-around trips to and from source cities. With little regard for consistency, DEA agents testify that each of the following constitutes a prominent profile factor: (1)

Non-stop or direct flights to and from source cities; and (2) Circuitous routes or changing airlines or flights to and from source cities.

### 3. Nervousness and Associated Behavior

Despite drug agents' testimony that they can detect "growing nervousness" or telltale eyes, there is no uniform or coherent list of profile factors relating to nervousness. Walking quickly is considered a prime behavior factor, but so is walking slowly. Walking in an unusual pattern through the terminal and rushing to the restroom after deplaning appear just as significant as leaving the terminal in a hurried and nervous manner. And although perspiring profusely, shortness of breath, and becoming nervous during an identification stop, comprise stock, boilerplate profile factors—appearing "cool" and exhibiting a "calm demeanor"—also constitute profile factors.

### 4. Significance of Luggage

All air travelers fit at least one of the profile factors regarding the use of luggage. DEA agents deem it significant when air travelers check no luggage. They also consider the following as decisive profile factors: Continuing to stare at a suitcase after checking it; failing to claim luggage at the baggage claim area; switching baggage claim stubs; having a companion claim the luggage; and placing an identification tag on checked luggage that differs from other forms of identification. Similarly, DEA agents testify inconsistently regarding the amount of luggage an air traveler carries. Carrying no luggage is as noteworthy as carrying a small tote bag, a medium-size bag, two bulky garment bags, "two apparently heavy-laden suitcases," or four pieces of luggage. Furthermore, agents speak inconsistently regarding the significance of the manner in which air travelers handle their luggage or possessions. For example, both disassociative behavior towards a briefcase and holding a briefcase firmly appear as profile factors in the case law.

### 5. Companions

The following inconsistent profile factors regarding drug couriers and their companions appear repeatedly in drug profile cases: an individual traveling alone; two or more people traveling together; people who travel together, but attempt to appear separate; and people who disclaim knowledge of traveling companions.

### 6. Personal Characteristics

Depending on which case is read, a typical drug courier is either a black male, a female, a black female, an Hispanic person, or a young person who may be "sloppily dressed" or "smartly dressed." And, of course, the drug courier can have a Fu Manchu mustache or collar-length hair.

### 7. Miscellany

The topical heading "Miscellany," with its omnibus implications, dramatically illustrates how incongruous and fatuous drug courier profile factors have become. For example, drug agents treat the following drug courier profile factors with equal significance: being the first, or one of the first, passengers to deplane; being the last passenger to deplane; and deplaning from the middle. By way of further example, making a local telephone call immediately after deplaning constitutes a profile factor, as does making a long-distance telephone call. Similarly, drug agents have testified that leaving the airport by public transportation, especially taxi, private vehicle, limousine, or hotel courtesy van all constitute profile factors.

That some DEA agents commendably and candidly admit they stop air travelers when anything arouses their suspicions does not obviate the need to cross-examine agents about the bases of their suspicions. Rather, such admissions highlight the inconsistencies among the factors relied on by drug agents and invite careful analysis

of the purported logic behind the drug courier profile.

Becton, *supra* at 439–44 (footnotes omitted).

One does not have to be a cynic to believe that, despite protestations to the contrary, a key but unarticulated and, perhaps, unrecognized factor in many cases is that the person's skin is, to use the words of Rodgers and Hammerstein, "of a different shade." [3]

■ This is not to say that a reasonable and prudent police officer or DEA agent is not free to keep a mental checklist of possibly relevant factors bearing on their important role in intercepting drug couriers. It is simply to say that drug courier profiles are not "scientific" in any sense of the word, that agents may not mechanically rely on them in making investigative decisions affecting the constitutional privacy interests of citizens, and that reviewing courts also must not engage in a mechanistic deference to police testimony that the defendant's conduct fit some profile. Rather, reviewing courts must instead focus on the totality of all the relevant circumstances bearing upon the propriety of the officer's conduct. *United States v. Sokolow*, 490 U.S. 1, 8–11, 109 S.Ct. 1581, 1587–88, 104 L.Ed.2d 1 (1989).

■ In this case the issue is not the propriety of the conduct of the police in approaching defendant and obtaining her consent to a search of her purse and her carry-on bag. The issue is the propriety of the prosecutor's eliciting the drug courier profile evidence not at a pretrial suppression hearing but during the state's case-in-chief at trial.

As Professor Graham says, evidence that a defendant has traits shared by those who in the past have acted as drug couriers "seems akin to character evidence." 22 Charles A. Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure—Evidence*, § 5233 (Interim ed. 1992 & Supp.1994). Professor Graham further states:

Normally proof of character involves witnesses who generalize on the basis of past acts of the defendant and this generaliza-

---

**3.** Richard Rodgers and Oscar Hammerstein II, "You've Got to Be Carefully Taught," *South Pa-*    *cific* (1949).

tion is used to support an inference as to the conduct in issue. The drug courier profile involves a generalization based on the past acts of third persons. The jury is asked to infer from the fact that the defendant shares some of the characteristics of these third persons that he shares their guilt of drug smuggling.

*Id.* at § 5233 n. 53.2 (Supp.1994).

Heretofore, we have not addressed the issue of admissibility of drug courier profile evidence at trial as evidence of the defendant's guilt. It appears, however, that most courts that have addressed the issue have concluded that the evidence is not generally admissible at trial on the issue of the defendant's guilt. *See, e.g., United States v. Jones,* 913 F.2d 174, 177 (4th Cir.1990), *cert. denied,* 498 U.S. 1052, 111 S.Ct. 766, 112 L.Ed.2d 785 (1991); *United States v. Carter,* 901 F.2d 683, 684–85 (8th Cir.1990); *United States v. Quigley,* 890 F.2d 1019, 1023–24 (8th Cir.1989), *cert. denied,* 493 U.S. 1091, 110 S.Ct. 1163, 107 L.Ed.2d 1066 (1990); *United States v. Lim,* 984 F.2d 331, 334–35 (9th Cir.1993), *cert. denied,* — U.S. ——, 113 S.Ct. 2944, 124 L.Ed.2d 692 (1993); *United States v. Lui,* 941 F.2d 844, 846–48 (9th Cir.1991); *United States v. Beltran–Rios,* 878 F.2d 1208, 1210 (9th Cir.1989); *United States v. Hernandez–Cuartas,* 717 F.2d 552, 555 (11th Cir.1983).

This is not to say that the cases hold that all testimony by police officers as to techniques employed by other drug dealers or couriers is always inadmissible at trial. *Compare United States v. de Soto,* 885 F.2d 354, 360–61 (7th Cir.1989) (testimony relating to techniques used by some other dealers to avoid detection admitted to explain defendant's conduct); *United States v. Nersesian,* 824 F.2d 1294, 1308 (2d Cir.1987) (testimony that coded language related to heroin), *cert. denied sub nom, Annabi. v. United States,* 484 U.S. 1061, 108 S.Ct. 1018, 98 L.Ed.2d 983 (1988); *State v. Collard,* 414 N.W.2d 733 (Minn.App.1987) (admission on issue of intent to sell of testimony by a police officer as to various levels in cocaine trade, typical single dosage of cocaine, amounts typically sold on the street, and meaning of figures·found in notes on slips), *pet. for rev. denied* (Minn., Jan. 15, 1988); Christopher Bello, Annota-tion, *Admissibility of Expert Testimony as to Modus Operandi of Crime—Modern Cases,* 31 ALR 4th 798 (1984).

We believe, however, that the evidence admitted in this case is clearly and plainly inadmissible. Basically, what the officers testified was that in their experience most drug couriers behave a certain way—*e.g.,* buy their tickets with cash, typically come from a so-called "source" city such as Detroit, typically use the club car on the train, etc.—and the jury was impliedly urged to infer that since defendant's conduct fit the profile, she must have known that her luggage contained crack cocaine. Admitting evidence of this sort is very similar to admitting evidence that a defendant in a child abuse case was abused as a child and that child abusers typically were abused as children, *State v. Loebach,* 310 N.W.2d 58 (Minn.1981) (ruling that evidence of battered parent syndrome is inadmissible), or like admitting evidence in a child abuse prosecution of the boy friend of the victim's single mother that single mothers' babysitting boy friends are more likely to be child abusers, *State v. Steward,* 34 Wash.App. 221, 660 P.2d 278 (1983) (reversing conviction because of erroneous admission of such evidence).

Defendant, by the way, did nothing at trial to invite the introduction of this evidence. The evidence was adduced during the state's case-in-chief. Defendant in her testimony merely claimed that she did not consciously possess the drugs, testimony that clearly did not open the door to the admission of the drug courier profile evidence.

■ (c) Finally, in our independent review of the record we noted that the prosecutor, in her closing statement, said:

Now what's the defense in this case? What kind of defense could you raise in a drug case? Well, okay, one possible defense would be, well, it's not drugs. That's not going to work in this case is it? Very clearly, this is cocaine.

Now, the defense may be—well, it might be cocaine, but it's not the appropriate amount of cocaine for the crime with which I'm charged. That doesn't work either. The two crimes with which defendant is

charged require, for Count I, more than 10 grams, for Count II, more than 25 grams. We have got 35 plus grams of cocaine. So that's not going to work in this case.

What might work? Okay. So there was cocaine in my bag, but I didn't put it there and I don't know how it could have gotten there.

██ This argument improperly invited the jurors to speculate with respect to the motivation behind defendant's decision to try the case as she did. This argument is similar to the "That's the sort of defense that defendants raise when nothing else will work" argument declared improper in prior cases of this court. *See, e.g., State v. Bettin,* 309 Minn. 578, 579, 244 N.W.2d 652, 654 (1976), relied upon most recently in *State v. Salitros,* 499 N.W.2d 815, 818 (Minn.1993) (interests of justice award of new trial to defendant because of unobjected-to misconduct by prosecutor that included an argument of this nature). The prosecutor in this case was fully free to specifically argue that there was no merit to the defense of lack of conscious possession in view of the evidence, but she was not free to belittle the defense of lack of conscious possession in the abstract or, as here, to suggest that the defendant raised it because that was the only defense that "might work." Moreover, the prosecutor was not free to urge the jurors to put themselves in the defendant's shoes and ask themselves if they ever had traveled and opened their luggage to "just magically find something in your bag that you hadn't put in there when you packed." Jurors are free to (and undoubtedly do) bring their own experiences to bear in assessing the credibility of a defendant's claim of lack of conscious possession in a case such as this. But it is improper for the prosecutor to urge the jurors to look at their own experiences as proof that the defendant's defense is not credible.

(d) In summary, while there undoubtedly was sufficient admissible evidence on which to base the verdict of guilty, our examination of the record convinces us that the combined effect of the prosecutor's misconduct—in eliciting the inadmissible hearsay evidence relating to the tip, in eliciting the inadmissible evidence that defendant fit a drug courier profile used by the officers, and in her closing argument—was to deprive defendant of a fair trial. Accordingly, we reverse defendant's conviction and remand for a new trial.

3. In view of our decision, we do not need to address the sentencing issue. However, we offer the following gratuitous comments.

Defendant is a mature adult who had a criminal history score of zero. She was convicted of an offense that, albeit serious, until recent years was not punishable nearly as harshly as it is now punished. The probation agent who prepared the presentence investigation report concluded that defendant was particularly amenable to treatment or rehabilitation in a probationary setting and therefore recommended that the trial court depart dispositionally and place the defendant on probation.

We normally do not interfere with the trial court's broad discretion to impose the presumptive sentence, which here was an executed prison term. While we are not prepared to say that we will grant defendant any relief if she is convicted after a retrial and is once again sentenced to an executed term of 81 months, we are prepared to say that the sentence seems particularly harsh given the facts of this case and defendant's personal circumstances that validly may be taken into consideration in determining whether to depart dispositionally. Moreover, we are not unmindful of nor insensitive to the growing body of evidence relating to "[t]he disparity of sentencing between people of color and whites." *See Racial Bias Task Force, supra* at 49–58. In the exercise of our supervisory powers over trial courts, we therefore intend to closely monitor and scrutinize sentencing practices to insure that defendants of color are not given harsher sentences for drug offenses such as this than Caucasian defendants.

*Reversed and remanded for a new trial.*