*This opinion will be unpublished and may not be cited except as provided by Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA**
**IN COURT OF APPEALS**
**A15-1519**

State of Minnesota,
Respondent,

vs.

Prince Antonio Dequante Jones,
Appellant.

**Filed December 19, 2016**
**Affirmed**
**Halbrooks, Judge**

Clay County District Court
File No. 14-CR-14-3506

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Brian J. Melton, Clay County Attorney, Pamela Harris, Chief Assistant County Attorney, Lori H. Conroy, Assistant County Attorney, Moorhead, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Julie Loftus Nelson, Assistant Public Defender, St. Paul, Minnesota (for appellant)

Considered and decided by Reilly, Presiding Judge; Halbrooks, Judge; and Johnson, Judge.

**U N P U B L I S H E D   O P I N I O N**

**HALBROOKS**, Judge

Appellant challenges his conviction under Minn. Stat. § 609.322, subd. 1(a)(2) (2012), arguing that the district court erred by allowing expert testimony that was not

relevant and amounted to inadmissible profile evidence and that the prosecutor committed misconduct by eliciting expert testimony that exceeded the scope of the district court's pretrial order. We affirm.

**FACTS**

In June 2014, M.A., a 13-year-old girl who had been reported by her father as a runaway, moved in with E.H. When E.H. asked M.A. if she wanted to prostitute herself, M.A. agreed. Soon after, M.A. provided sexual services for money at a hotel in Plymouth. On June 10, 2014, appellant Prince Antonio Dequante Jones drove M.A. and E.H. to Moorhead in a maroon Chevy Impala that Jones's girlfriend had rented. Later that evening, Jones and E.H. placed an advertisement for M.A.'s prostitution on an adult-entertainment site using a prepaid credit card. Detective Ryan Nelson, who was investigating underage sex trafficking, subsequently called in response to this ad. Detective Nelson agreed to a fee and services, and he was told to go to a motel in Moorhead and to then call for the room number. A short time later, Detective Nelson and Detective Robert Porter knocked on M.A.'s hotel room door. M.A. answered, initially giving the officers a false name and age. As they talked, M.A.'s cell phone rang multiple times.

M.A. lied to Detective Nelson and Detective Porter, telling them that her sister and her sister's boyfriend were in the red car in the parking lot and that the phone calls she kept receiving were from her sister; but M.A. knew that the phone calls were from E.H. Detective Nelson saw a maroon vehicle in the parking lot from a window in the hotel room; when he looked again a short time later, it was gone.

2

Detective Nelson obtained a court order to acquire the GPS location for E.H.'s phone and tracked it to a hotel parking lot in Fargo, North Dakota. A maroon car was parked in the vicinity of a hotel room that was registered in Jones's name.[1] Detective Nelson found Jones and E.H. in the hotel room and took them to the police station, where Jones and E.H. were subsequently arrested. Detective Nelson seized two cell phones from Jones, including the prepaid cell phone associated with the phone number that called M.A.'s phone several times while speaking with Detective Nelson. The state charged Jones with first-degree sex trafficking for promoting the prostitution of a minor, in violation of Minn. Stat. § 509.322, subd. 1(a)(2) (2012), and third-degree criminal sexual conduct, in violation of Minn. Stat. § 609.344, subd. 1(b) (2012).

At a pretrial hearing, the district court heard arguments on the admissibility of the proposed testimony from two expert witnesses for the state: Ann Quinn and Joy Friedman. Quinn has worked with the Department of Homeland Security Investigations and is a special agent with the Minnesota Bureau of Criminal Apprehension Special Investigations Unit. The state noted that Quinn's testimony would include information regarding: (1) common slang terms, (2) common practices used by sex-traffickers to their control victims, (3) common recruitment and grooming techniques used by sex-traffickers, (4) street-based and online prostitution methods, (5) the process of posting online advertisements for prostitution, (6) the use and reasons for using prepaid phones and prepaid credit cards,

---

[1] Detective Nelson initially believed the maroon car to be the same vehicle that he had seen in Moorhead but later determined that it was not.

(7) organizational characteristics of sex-trafficking operations, and (8) methods of protection against discovery by law enforcement.

Friedman is a training and outreach manager for Breaking Free, Inc., an organization that provides services to people escaping sex trafficking. The state indicated that Friedman's testimony would include information regarding the following characteristics of sex-trafficking victims: (1) a suspicion of law enforcement, (2) a reluctance to seek help, (3) a lack of cooperation with professionals, (4) continued loyalty to their sex traffickers, (5) a tendency to remain in sex-trafficking relationships, and (6) a reluctance to disclose their situation to friends or family.

Jones did not file a written objection but argued at the pretrial hearing that the experts should not be allowed to testify. Jones contended that there was no foundation for Quinn's prospective testimony and that the terms, practices, and techniques to which Quinn would testify were not relevant because they were not present in his case. Jones also argued that Quinn's testimony regarding online prostitution and prepaid phones and credit cards was not based on specialized knowledge. With respect to Friedman's prospective testimony, Jones argued that it lacked foundational reliability and was not relevant because those characteristics were not present in his case.

On the record at the hearing, the district court ruled that Quinn could testify as an expert for the state but limited her opinions to those that "relate[d] to evidence that the state has introduced or will, with certainty, introduce throughout their case-in-chief." The district court clarified that Quinn could testify to aspects of sex trafficking that would "help the jury to follow the testimony of the detectives" or "bolster the opinions of the

4

detectives," but stated that it was not appropriate for Quinn to "give all of the different customs and practices that may exist relating to sex trafficking in the State of Minnesota."

The district court took the issue of Friedman's testimony under advisement. The following day, in a written order that addressed all of the parties' motions in limine, the district court determined that Quinn could testify "subject to the limitations stated on the record" but not to "any aspect of the prostitution business that is not involved in [Jones's] case." The district court also ruled that Friedman could testify "subject to the same limitations imposed upon Agent Quinn" but not to "any psychological or behavioral characteristic that is not involved in [Jones's] case."

Following a ten-day trial, the jury found Jones guilty of first-degree sex trafficking for promoting prostitution and not guilty of third-degree criminal sexual conduct. This appeal follows.

## DECISION

### I.

Jones contends that the district court erred by admitting expert testimony regarding the general operations of sex trafficking and the behaviors of people involved in sex trafficking because it was irrelevant and amounted to inadmissible profile evidence that was highly prejudicial to him. "The admission of expert testimony is within the broad discretion accorded [to] a [district] court, and rulings regarding materiality, foundation, remoteness, relevancy, or the cumulative nature of the evidence may be reversed only if the [district] court clearly abused its discretion." *State v. Ritt*, 599 N.W.2d 802, 810 (Minn. 1999) (quotation and citation omitted). "The ultimate question of admissibility for expert

testimony is whether the expert's testimony will help the trier of fact in evaluating evidence or resolving factual issues." *State v. DeShay*, 669 N.W.2d 878, 884 (Minn. 2003) (quotation omitted).

The supreme court has clarified that expert testimony must be related to an issue the state must prove. *State v. Lopez-Rios*, 669 N.W.2d 603, 612 (Minn. 2003); *DeShay*, 669 N.W.2d at 888. If the issue can be resolved by general or common knowledge, then the jury is in as good a position as the expert to resolve the issue, and expert testimony should not be admitted because it is of little assistance. *DeShay*, 669 N.W.2d at 885.

> [E]xpert testimony must assist the jury to understand the evidence or to determine a fact in issue. . . . Such testimony must add precision or depth to the jury's ability to reach conclusions about matters that are not within its experience. Moreover, this testimony must be carefully monitored by the court so that the testimony will not unduly influence the jury or dissuade it from exercising its independent judgment.

*Id.* at 887-88. But where expert testimony is connected to an element of the offense and can help the jury decide if the state has met its burden of proving an element of the offense, admission of expert testimony is proper. *See State v. McDaniel*, 777 N.W.2d 739, 748-49 (Minn. 2010).

Jones argues that the district court erred by allowing expert testimony on sex trafficking because the testimony was not relevant to his promoting-prostitution charge. Jones was charged with "promot[ing] the prostitution of an individual under the age of 18 years." Minn. Stat. § 609.322, subd. 1(a)(2). A person promotes the prostitution of an individual when he knowingly "transports an individual from one point within this state to

another point either within or without this state, or brings an individual into this state to aid the prostitution of the individual." Minn. Stat. § 609.321, subd. 7(6) (2012). Therefore, one of the elements that the state had to prove was that Jones intended to aid M.A.'s prostitution. *Id.*

Here, Quinn's testimony explained the significance of Jones's providing a car; transporting M.A. to the hotel; placing an advertisement; providing a cellular telephone; and waiting outside in the parking lot when Detective Nelson, the alleged client, arrived for sexual services. Quinn also explained the prevalence of these characteristics in sex trafficking to help the jury understand whether these actions aided M.A.'s prostitution. Because this testimony related to an element of Jones's promoting-prostitution charge, it was relevant.

Friedman testified about general sex-trafficking practices and common behaviors of sex-trafficking victims, including the counterintuitive behaviors and lesser-known aspects of sex-trafficking victims that might otherwise be interpreted by the jury as a lack of credibility. In an analogous circumstance, the supreme court permitted expert testimony on battered-woman syndrome to explain counterintuitive behaviors to the jury that might otherwise be interpreted as a lack of credibility. *State v. Grecinger*, 569 N.W.2d 189, 195 (Minn. 1997). Because M.A. testified, the jury was tasked with determining her credibility. Friedman's testimony helped the jury weigh M.A.'s testimony by explaining behaviors common to sex-trafficking victims. For this reason, Friedman's testimony was relevant.

Jones next contends that the district court's evidentiary ruling was error because the experts' testimony amounted to inadmissible profiling evidence. Profile evidence is

7

similar to character evidence. *State v. Williams*, 525 N.W.2d 538, 547-48 (Minn. 1994). But while character evidence relies on a defendant's past actions to support an inference as to the defendant's guilt, profile evidence relies on the past actions of a third person to support an inference that the defendant shares the third person's guilt. *Id.*

In *Williams*, the supreme court first addressed the admissibility of profile evidence in the context of a drug courier. *Id.* at 548. Without seeking a pretrial ruling from the district court, the state, in its case-in-chief, presented evidence of a profile shared by most drug couriers: buying tickets with cash, typically coming from a "source" city, often using the club car on the train, etc. *Id.* at 547-48. While the supreme court noted that "[t]his is not to say that . . . all testimony by police officers as to techniques employed by other drug dealers or couriers is always inadmissible at trial," this use, in which the state "impliedly urged" the jury to infer that since William's conduct fit the profile, she must have known that her luggage contained crack cocaine, was "plainly inadmissible." *Id.*

In *State v. Litzau*, following a pretrial hearing, the district court ruled that the state could present evidence through the expert testimony of a member of a drug task force that suggested, based on the quantity of drugs, that Litzau was selling drugs as opposed to just using drugs. 650 N.W.2d 177, 185 (Minn. 2002). At trial, the defense objected on the grounds that the state's expert witness exceeded the district court's ruling by testifying that drug dealers often purchase vehicles without transferring title to their own names, transport drugs with an older vehicle to avoid forfeiture of a newer one, hide drugs in obscure places, and consent to searches. *Id.* Without objection from the defense, the district court gave the jury an instruction on permissive inference. *Id.* at 182. Litzau was convicted. *Id.*

8

Because of the cumulative effect of evidentiary rulings, the supreme court reversed and remanded for a new trial. *Id.* at 180. With respect to the state's use of so-called profile evidence, the supreme court held that the testimony was plainly inadmissible under *Williams*. *Id.* at 185.

In *State v. Barajas*, we examined the concept of profile evidence and determined that testimony that explains the significance of certain evidence or the defendant's conduct was not inadmissible profile evidence. 817 N.W.2d 204, 223 (Minn. App. 2012), *review denied* (Minn. Oct. 16, 2012). In *Barajas*, the officer's testimony explained how certain items recovered from Barajas's apartment could have been used in the sale of drugs. *Id.* The officer testified that drug dealers use substances like dry milk, which was found in Barajas's apartment, as "cutting agents" to increase the volume of their product; that drug dealers use prepaid cellular telephones—like the one recovered from Barajas—so they can easily switch telephones and telephone numbers to avoid being tracked by the police; and that large plastic bags—like the ones found in Barajas's apartment—are typically used by drug dealers to package and transport drugs while concealing their odor. *Id.* Because the officer's testimony explained to the jury the significance of the evidence presented against Barajas, we concluded that the evidence was not plainly inadmissible, and the district court did not err by admitting it. *Id.*

Based on our review of this record, we conclude that expert testimony was foundational, establishing expertise and defining terms common to this criminal activity. This testimony was necessary to help the jury understand the evidence presented against Jones because sex-trafficking crimes were uncommon in the county at the time that Jones

9

was tried. Friedman's testimony helped explain the behaviors of a sex-trafficking victim that a jury might not otherwise understand, which helped the jury properly weigh M.A.'s testimony. As described with approval in *McDaniel*, the testimony was pertinent to the specific issues and facts of this case and helped the jury decide if the state had met its burden of proof. *See* 777 N.W.2d at 748-49. We therefore conclude that the expert testimony did not amount to profiling evidence and that its admission was not an abuse of the district court's discretion.

## II.

Jones asserts that the prosecutor committed reversible misconduct when she elicited general information about the sex-trafficking industry that exceeded the district court's pretrial limitations. At the outset, we note that Jones did not object to this testimony at trial. When the defendant fails to object, we review a claim of prosecutorial misconduct under a modified plain-error standard, requiring (1) error, (2) that is plain, and (3) that affects the defendant's substantial rights. *State v. Ramey*, 721 N.W.2d 294, 302 (Minn. 2006). "If these three prongs are satisfied, the court then assesses whether the error should be addressed to ensure fairness and the integrity of the judicial proceedings." *Id.*

The defendant bears the burden of proving that error occurred and that it was plain. *Id.* A defendant can meet his burden by establishing that the state's acts violated "clear or established standards of conduct, e.g., rules, laws, orders by a district court, or clear commands in this state's case law." *State v. Fields*, 730 N.W.2d 777, 782 (Minn. 2007). Under the modified plain-error standard, the state bears the burden of proving there is no

reasonable likelihood that the absence of the misconduct would have had a significant effect on the jury's verdict. *Ramey*, 721 N.W.2d at 302.

The district court restricted the expert witnesses' testimony to those opinions that related to the evidence that the state presented against Jones. On appeal, Jones contends that the prosecutor exceeded the district court's order when she asked Quinn to define terms that she used in her testimony, including "john sting," "jane sting," "proactive investigation," "reactive investigation," "incall," "outcall," "Erotica Review,"[2] and "bottom bitch" and elicited Quinn's testimony related to the fact that street-corner prostitutes are now less common and concerning the Gerald Vick Human Trafficking Task Force, interview protocols, and forensic-interviewing techniques. Jones also contends that the prosecutor exceeded the scope of the district court's order when she asked Friedman questions relating to: (1) the terms "enforcer," "generational prostitution," and "bottom girl"; (2) the risk factors for teenaged girls becoming involved in prostitution, including mental-health issues, low self-esteem, and poverty; (3) the physical appearance of a sex-trafficked teenaged girl; (4) how sex-traffickers keep girls in line; and (5) the history of how victims have been treated as criminals. Quinn's testimony that Jones challenges on appeal was elicited during an explanation of her experience in the sex-trafficking field that was necessary to establish Quinn as an expert witness and lay foundation for her later testimony. Friedman's testimony that Jones now challenges was elicited during the portion of her testimony addressing her background assisting victims of sex-trafficking operations

---

[2] Jones objected when the state asked Quinn a question regarding "Erotica Review" on relevance grounds, but the district court overruled the objection.

11

in order to establish foundation for her as an expert witness and provide the jury with sufficient information to properly weigh M.A.'s credibility as a witness. For these reasons, we conclude that the expert testimonies did not exceed the district court's limitations and that the prosecutor did not commit misconduct.

But even if the evidence did exceed the scope of the district court's order, the state demonstrated that there is no reasonable likelihood that the absence of the alleged misconduct would have had a significant effect on the verdict. *See Ramey*, 721 N.W.2d at 302. In *Lopez-Rios*, the supreme court addressed whether it was admissible for an expert witness to testify to general information on criminal street gangs in a gang-related murder case. 669 N.W.2d at 611-13. The supreme court held that it was error to admit expert testimony that was duplicative of other testimony, related to general gang activity and affiliations, extraneous to the factual issues before the jury, and prejudicial, but that the testimony was not sufficiently prejudicial to justify a new trial. *Id.* at 613.

Here, the expert testimony that Jones challenges is largely composed of terms related to sex trafficking, how sex-trafficking investigations are conducted, and how sex traffickers operate. The evidence that Jones does not challenge established that (1) Jones's girlfriend rented the car that Jones drove to Moorhead, (2) Jones went to the store to get a card to place an advertisement for M.A.'s prostitution, (3) Jones said the phone was "booming" after the advertisement was placed, (4) one of Jones's cellular telephones was calling M.A.'s phone when Detective Nelson found M.A. in the hotel room, (5) Jones was in a car in the parking lot when Detective Nelson found M.A., and (6) Jones changed the number on one of his two cellular telephones after the police started tracking that phone

12

number.  This evidence outweighs any possible prejudicial effect the alleged misconduct may have had on the jury's verdict.  *See State v. McNeil*, 658 N.W.2d 228, 236 (Minn. App. 2003) (holding that prosecutorial misconduct did not deny a defendant his right to a fair trial because it was outweighed by the victim's testimony).

**Affirmed.**