STATE OF MINNESOTA

IN SUPREME COURT

A23-0007

Hennepin County                                                    Chutich, J.
                                         Concurring, Thissen, Procaccini, JJ.
                                                    Took no part, Hennesy, J.
State of Minnesota,

               Respondent,

vs.                                                       Filed:  July 24, 2024
                                                    Office of Appellate Courts
Jamal L. Smith,

               Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Mary F. Moriarty, Hennepin County Attorney, Mark W. Osler, Deputy Hennepin County Attorney, Adam E. Petras, Assistant Hennepin County Attorney, Minneapolis, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Davi E. Axelson, Assistant State Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.     Appellant failed to show that the district court judge was biased.

2.     Appellant failed to show that defense counsel was ineffective because counsel did not move to change venue.

1

3.      Appellant's claim that the grand and petit jury pools did not reflect a fair cross-section of the community fails because he did not show that Black persons were underrepresented in the jury pool selection process or that any underrepresentation resulted from systematic exclusion.

4.      The district court did not abuse its discretion when it admitted evidence of appellant's prior bad acts because the evidence was admissible under the *Spreigl* exception or as direct or corroborative evidence of a charged crime.

5.      The only reasonable inference supported by the circumstances proved, when viewed as a whole, is that appellant fired the fatal shot.

Affirmed.

O P I N I O N

CHUTICH, Justice.

Appellant Jamal L. Smith was convicted for shooting and killing Jay Boughton in a tragic road rage shooting. A grand jury indicted Smith with several offenses, including first-degree intentional murder while committing a drive-by shooting. Minn. Stat. § 609.185(a)(3) (2022). Smith moved to dismiss the indictment based on the racial composition of the grand jury, which he asserted failed to reflect a fair cross-section of the community, and to request an expanded petit jury pool. The district court denied the motion. Before trial, the State moved to admit evidence of Smith's prior bad acts, arguing that it was admissible under the immediate episode exception or, alternatively, the *Spreigl* exception. *See State v. Spreigl*, 139 N.W.2d 167, 169 (Minn. 1965). The district court granted in part and denied in part the State's motion and admitted some of the evidence

2

under the immediate episode exception. A jury found Smith guilty as charged. The district court sentenced him to life with the possibility of release for the conviction of first-degree intentional murder while committing a drive-by shooting, as well as a concurrent sentence of 120 months for possession of ammunition or a firearm after being convicted of a crime of violence. Minn. Stat. § 624.713, subd. 1(2) (2022).

On direct appeal to our court, Smith contends that he is entitled to a new trial for four reasons.[1] First, Smith argues that the district court was biased against him, as shown by several adverse rulings. Second, he claims that he received ineffective assistance of counsel because defense counsel failed to move for a change of venue. Third, Smith alleges that the district court committed reversible error when it denied his motions regarding the racial composition of the grand and petit jury pools. Fourth, he posits that the district court committed reversible error when it admitted evidence of his prior bad acts. Finally, Smith argues that his conviction of first-degree intentional murder while committing a drive-by shooting must be reversed because the State presented insufficient evidence to prove that he fired the shot that killed Boughton.

Because Smith failed to carry his burden on each of the new trial claims and because the only reasonable inference supported by the circumstances proved—when viewed as a whole—is that Smith fired the fatal shot, we affirm the judgment of convictions.

---

[1]     The first two arguments are raised in Smith's pro se supplemental brief.

**FACTS**

A Hennepin County grand jury indicted Smith of three offenses arising out of the fatal drive-by shooting of Jay Boughton: first-degree intentional murder while committing a drive-by shooting under Minnesota Statutes section 609.185(a)(3), second-degree unintentional murder while committing a drive-by shooting under Minnesota Statutes section 609.19, subdivision 1(2) (2022), and possession of ammunition or a firearm after being convicted of a crime of violence under Minnesota Statutes section 624.713, subdivision 1(2). The two murder charges also cited Minnesota Statutes section 609.05, subdivisions 1 and 2 (2022), which concerns liability for the crimes of others, based on an alternative theory that Smith acted as an accomplice in the shooting of Boughton. Smith moved to dismiss the indictment, arguing that there were "numerous and cumulative defects" in the grand jury proceeding, including that the jurors were exposed to detailed reporting about the shooting before the proceeding. The district court denied the motion to dismiss.

Despite pretrial publicity on the case, defense counsel did not move to change venue. But counsel did move to challenge the composition of the grand jury pool, asserting that it did not reflect a fair cross-section of the community because Black persons were allegedly underrepresented. Smith also requested an expanded petit jury pool. After briefing and oral argument, the district court denied the motion.

Before trial, the State moved to admit evidence of prior bad acts committed by Smith, arguing that it was admissible under the immediate episode exception or, alternatively, the *Spreigl* exception. This evidence included a video taken by Smith

showing himself brandishing a pistol and a witness's account of another road rage episode involving Smith, each of which occurred mere hours before the shooting. The district court granted the State's motion in part, concluding that evidence of six prior bad acts, including the pistol video and evidence of the road rage episode, were admissible under the immediate episode exception. The district court did not analyze this admitted evidence under the *Spreigl* exception. It also denied the State's request to include evidence of other bad acts that Smith had allegedly committed.

At trial, the State presented the following evidence. On July 6, 2021, Smith drove with B.S. and A.S from Chicago to the Twin Cities metro area to visit his girlfriend. Smith was driving a silver Chevrolet Suburban SUV that his girlfriend had rented in April but that Smith had never returned.

Videos on Smith's phone documenting parts of the trip were admitted at trial under the immediate episode exception, and their admission is now challenged by Smith. One video, taken at 3:21 p.m. and uploaded to Facebook, depicted A.S. driving while Smith, a Black man with dreadlocks, waved a pistol with an extended magazine from the front passenger seat. B.S. was sitting in the back seat with what an officer later described as a "no stock A-K style rifle" on his lap. In the video, Smith wears a white t-shirt and a black crossbody bag that has a distinctive white design on the strap. A different video taken earlier that day showed a third gun located between the center console and the driver's seat where A.S. was sitting at the time.

At 9:43 p.m., the Suburban arrived at an Arden Hills animal hospital where Smith's girlfriend had been earlier that day. When Smith learned that his girlfriend was no longer

5

there, he rushed to meet her at her apartment, located off the Shelard Parkway exit of Highway 169. Witness testimony and highway camera videos showed that after leaving the animal hospital, the Suburban weaved through cars on Highway 169, driving faster than traffic and tailgating other cars.

That same night, Jay Boughton was driving his 15-year-old son home from his son's baseball game. It was raining as they drove south on Highway 169 with the Suburban to their left. When the Suburban tried to merge into their lane from the lefthand lane, it almost hit Boughton's truck. Boughton swerved, honked his horn, and "flipped . . . off" the Suburban.

A highway traffic camera showed that between 9:58:34 p.m. and 9:58:48 p.m. the Suburban drove directly alongside Boughton's truck, pacing it, for at least one-quarter mile. The police investigation revealed that while the Suburban kept pace with Boughton's truck, a single .45-caliber bullet was fired from the Suburban, striking Boughton in the neck.

Boughton's truck veered off the highway, breaking through a fence and hitting several parked cars in an apartment complex parking lot in Plymouth. When the police arrived, they found a bullet from a large caliber gun on the floor of the truck and a bullet hole in the frame between the windshield and front passenger door. When investigators later processed the crime scene, they determined that the bullet came through the driver's side of the truck, and they found broken glass in the left lane near where Boughton's truck left the highway.

6

Boughton was taken to the hospital where he later died. His autopsy showed that he had suffered one gunshot wound that hit his carotid artery and jugular vein, causing him to bleed to death.

During trial, the State presented the following evidence as to how the police identified the Suburban as the car in question and Smith as the alleged shooter. Police used highway cameras to identify the suspect vehicle as a white or silver Suburban. They tracked its path before and after the shooting. After the shooting, the Suburban left the highway on the Shelard Parkway exit. The next day, police published a news release about the shooting and sought information about the Suburban.

Nine days after Boughton's murder, a silver Suburban with Colorado plates was reported abandoned in north Minneapolis. The police were called after a tow truck driver recognized it as the suspect vehicle from the highway shooting. The police then impounded the Suburban and searched it. They learned that the Suburban had been rented by Smith's girlfriend that April. When it was not returned on time, the rental company caused a GPS tracker to be placed on the Suburban to try to repossess it.

From the GPS data, police identified the Shelard Parkway address of Smith's girlfriend and canvassed businesses near there. Gas station surveillance footage showed Smith on at least four occasions, a few weeks before the shooting, wearing a black crossbody bag with a distinctive white pattern on the strap. Police also obtained animal hospital surveillance video from the night Boughton was killed that showed that the driver of the Suburban was someone in a white t-shirt with a black crossbody bag across his chest.

7

Police searched the Facebook friends of Smith's girlfriend and found a profile that belonged to "J'milli Smith." The profile picture matched the appearance of the Suburban driver from gas station footage, later identified as Smith. On Smith's Facebook profile, police found one of the videos taken during the July 6 trip in which Smith waved a pistol with an extended magazine. The serial number was visible on the pistol, so officers traced it and determined that it was a .45-caliber automatic Springfield Armory pistol. A forensic scientist later determined that the bullet in Boughton's truck had been shot from a .45-caliber gun and that Springfield Armory was one of 14 firearm companies that may have produced that type of gun.

Police obtained a warrant to search the apartment of Smith's girlfriend. They found items in Smith's name including mail and an identification card, a holster that his girlfriend identified as Smith's, and a black crossbody bag with the distinctive white design on the strap that matched the one worn by Smith on July 6.

The crime lab processed the Suburban and that evidence was introduced at trial. Six interior areas of the Suburban were processed for gunshot residue.[2] Three complete three-component gunshot residue particles and 20 two-component particles consistent with

---

[2] When a gun is fired, gunshot residue lands on the hands, clothing, and surrounding area of the shooter. The three component particles of gunshot residue (lead, antimony, and barium) can also be found on anyone close to the gun when it is fired, or any surface touched by a person who has gunshot residue on them. Gunshot residue can extend out to 5 feet from the gun, but heavier concentrations of particulate are typically found closer to the gun. Weather and movement can impact whether gunshot residue can be collected from an item or person. Testing can detect particles containing the three elements that make up gunshot residue; particles that contain only two of those three elements are also consistent with gunshot residue but are referred to as two-component particles.

gunshot residue were found on the interior of the front passenger door. Located on the interior of the rear passenger door was just one two-component particle consistent with gunshot residue. One complete three-component gunshot residue particle was additionally detected on the exterior of the black crossbody bag worn by Smith the day of the shooting.

Before Smith was arrested, police executed a warrant to obtain cell phone location data that showed that, on July 6, Smith, A.S., and B.S. traveled the same path from Indiana, through Chicago, to the apartment of Smith's girlfriend in Minnesota. The FBI also analyzed phone records obtained pursuant to a warrant that showed that all three of the men were in the area of Boughton's murder when it occurred.

The police arrested Smith in Illinois in August 2021 and obtained the following evidence. Smith had a .45-caliber bullet on his person when he was arrested, and when officers searched the apartment where he was staying, they found a .22-caliber rifle that matched the gun that B.S. held in the Facebook video. Smith now challenges the admission of this evidence.

After Smith was arrested, police also searched his phone and confirmed that one of his usernames was "J'milli Smith" and that other videos had been created on and around July 6. B.S. is never seen holding the .45-caliber pistol with the extended magazine in the videos taken on July 6. A video on Smith's phone from July 7, the day after the shooting, shows Smith and B.S. sitting next to each other in a car; B.S. has a pistol with an extended magazine in his hand like the .45-caliber pistol that was in Smith's hands the day before. Videos taken 4 and 5 days after the shooting—on July 10 and 11—show Smith with a .45-caliber pistol with an extended magazine.

During the search of Smith's cellphone, the police found text messages between Smith and A.S., and these were introduced at trial. The morning after the murder, A.S. sent Smith a news article that included the police press release seeking information about the shooting and an image of the suspected Suburban.

Eight days after the shooting, Smith sent A.S. these texts in which he appears to apologize to A.S.:

> THIS [is] MY LIFE EVERYONE GIVING or MAKING REASONS WHY they can't just be There . . . I know I overplayed my PART TOOOOOOOOOOOOOOOOOOO MANY TIMES . . . HOW YOU GIVING IT TO ME.

Seconds later Smith added, "UNDER THESE CIRCUMSTANCES."

Over half an hour later, Smith followed up with the following:

> First please DON'T OVERSTAND I DEFINITELY DNT MEAN NO HARM . . . This sh*t Ways on a n**** CONSTANTLY DEALING with sh*t . . . if I Caused you ANY DISRUPTION [A.S.] I Sincerely Apologize. Just gotta take this sh*t for what it is and switch sh*t up.

A.S. responded:

> You definitely wrong for me message bro I been trying to help you figure sh*t out since day one . . . I been nothing but solid since you met me when from this situation and the last I stayed solid and never showed a hint of following even while being on papers . . . I OVERSTAND the severity of it but I can't just to and switch . . . .

Police also arrested B.S. in August 2021. He did not have any firearms or ammunition on his person when he was arrested, nor did he have any at the house where he was staying. Police searched his cellphone and discovered that B.S. had sent outgoing text messages on July 6 at 9:58:02 p.m., 9:59:47 p.m., and 10:00:05 p.m.; about 1 minute before and after the pistol was fired from the Suburban. Police also found a video on B.S.'s

10

phone that was taken on July 7 of him and a woman, each holding a gun. The pistol that he held had an extended magazine, and a detective from the Plymouth Police Department opined it was the same gun as the .45-caliber pistol with an extended magazine seen in Smith's hands in the video posted to Facebook the day before—the day that Boughton was shot.

Smith's girlfriend testified at trial that Smith drove from Chicago to Minnesota on July 6 to see her. He arrived at her apartment late at night with A.S. and another man she did not know. Later, Smith drove them in the Suburban to a bar in Hennepin County. At some point that night, she saw Smith holding a rifle and sitting next to the rifle while it was on the center console of the Suburban. On July 8, he told her that the Suburban's brakes needed repairs. Smith abandoned the Suburban in Minneapolis and returned to Chicago by bus 2 days later.[3]

When Smith's girlfriend later saw an article about Boughton's murder, she recognized that the suspect car was the Suburban that Smith drove. She called him to ask about it and Smith responded, "they don't got no proof, they don't have no evidence."

Officers listened to Smith's phone calls while he was in jail. He first claimed on the calls that he did not know anything about the murder and that he had not been in Minnesota. Later, Smith admitted to a news reporter over a video call that he was driving the Suburban when Boughton was fatally shot.

---

[3]     B.S. and A.S. left Minnesota together by bus on July 9.

11

When he was in jail, Smith also gave people instructions about his case. He told his girlfriend not to cooperate and, after she testified at a hearing, he told her that she should have pleaded the Fifth.[4] Smith also told his girlfriend to contact his attorney and say that she had lied when she spoke to the police. After the trial started and Smith's girlfriend had met with prosecutors, Smith told her during a call that the rifle that she saw on the night of the shooting was not in his hands but on the car seat. Smith also instructed someone to delete his Facebook page and told an unidentified male to avoid getting "papers"— meaning a subpoena—shortly after the trial date was set.

A jail deputy testified about an interaction with Smith in jail after Smith tried to intervene while the deputy was dealing with another inmate. The deputy told Smith to mind his own business and Smith responded by saying, "Do you even know who I am? . . . I'm a nationwide murderer. . . . Go ahead and put it in your notes, I don't care, I'm a murderer."

Another witness testified at trial about a road rage episode involving Smith that occurred just hours before the July 6 shooting; admission of this testimony is now challenged by Smith. That witness testified that on July 6, while he was driving home from work on I-90 in Wisconsin, he encountered a big white SUV with a red and white license plate. The Colorado license plate on the Suburban was white with red letters and numbers. While the witness was passing a semi-truck, the SUV was behind his car, tailgating so close

---

[4]     The Fifth Amendment of the United States Constitution provides that no person "shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V.

that he could not see its headlights. The witness tapped his brakes to get the SUV driver to back off. When he did so, the SUV driver, a Black man with dreadlocks, pointed a pistol out the driver side window at him. After the witness passed the semi-truck and moved into the right lane, the SUV pulled up beside his vehicle, going about 85 to 90 miles per hour. The occupants pointed three guns at him before the car sped away. The witness immediately called 911, and dispatch received the call around 6:30 p.m. Cellphone data placed Smith in the same area as the witness when the witness called 911.

After the State rested, Smith testified in his own defense. His testimony substantially narrowed the issues in dispute at trial because he admitted that he was driving the Suburban when the fatal shot was fired from it. He claimed, however, that B.S. was the shooter.

Smith testified about the events on Highway 169 in the moments leading up to—and following—the shooting. He said that he tried to switch lanes because the GPS alerted him that the exit to his girlfriend's apartment was approaching. It was dark and raining, and Smith testified that he did not see Boughton's truck or hear Boughton honk the horn.

Smith said that B.S. lowered his window, and the wind noise caused Smith to turn his attention backwards. He heard a loud boom that he thought might have been thunder. Smith claimed that he did not know it was a gunshot. He said that A.S. jumped, and Smith wanted to duck but could not because he was driving. Smith testified that he did not see Boughton's truck drive off the road and that he kept driving to his girlfriend's apartment.

Smith also testified that A.S. had brought two pistols and one rifle on the drive from Chicago to Minnesota. He said that the guns were not "necessarily" A.S.'s but were

13

"shared guns."  Smith knew that he was prohibited from possessing guns, but he admitted that he allowed A.S. to bring the guns, that he handled a .45-caliber pistol during the drive to Minnesota, and that his phone has dozens of photographs of him with guns.

Concerning the road rage episode in Wisconsin, Smith did not deny that it had occurred.  He testified though that someone "might have, you know, [waved] some guns and stuff around, and that was over with after that."  He denied pointing a gun at the driver in the Wisconsin road rage incident and testified that it would have been physically impossible for him to do that while driving as fast as he was.

The jury found Smith guilty on all three counts.[5]  The district court entered convictions of first-degree intentional murder while committing a drive-by shooting under Minnesota Statutes section 609.185(a)(3) and possession of ammunition or a firearm after being convicted of a crime of violence under Minnesota Statutes section 624.713, subdivision 1(2).  The court sentenced Smith to life with the possibility of release and a concurrent sentence of 120 months respectively.  Smith appealed.

## ANALYSIS

On appeal, Smith contends that he is entitled to a new trial for four reasons.  First, Smith argues that the district court was biased against him, as evidenced by several adverse rulings.  Second, he asserts that defense counsel was ineffective for failing to move for a change of venue.  Third, Smith claims that the district court committed reversible error

---

[5]     The jury was not required to specify whether it found Smith guilty of first-degree intentional murder and second-degree unintentional murder as the principal shooter or as an accomplice to the shooting.

14

when it denied his motion challenging the racial composition of the grand and petit jury pools. Fourth, he argues that the district court committed reversible error when it admitted evidence of Smith's prior bad acts.

In addition, Smith argues that his conviction of first-degree intentional murder while committing a drive-by shooting must be reversed because the State presented insufficient evidence to prove that he fired the shot that killed Boughton. We consider his arguments in turn.

I.

We begin by determining whether the district court was biased against Smith. "Whether a judge has violated the Code of Judicial Conduct is a question of law that we review de novo." *State v. Malone*, 963 N.W.2d 453, 464 (Minn. 2021). Every criminal defendant is entitled to a neutral tribunal. *McKenzie v. State*, 583 N.W.2d 744, 747 (Minn. 1998).

Rule 2.11(A) of the Minnesota Code of Judicial Conduct provides that a judge must disqualify themself "in any proceeding in which the judge's impartiality might reasonably be questioned." Minn. R. Jud. Conduct 2.11(A). A judge's impartiality is an objective consideration, evaluating "whether a reasonable examiner, with full knowledge of the facts and circumstances, would question the judge's impartiality." *In re Jacobs*, 802 N.W.2d 748, 753 (Minn. 2011). It is presumed that a judge has properly discharged their duties. *Malone*, 963 N.W.2d at 464. "To remain impartial, judges should avoid the appearance of impropriety and act to assure that parties have no reason to think their case is not being handled fairly." *Id.*

In his pro se supplemental brief, Smith asserts that his right to due process was violated because the district court was not impartial in several rulings—including in setting his bail, restricting his phone privileges in jail, and denying his motion to dismiss the indictment. He essentially challenges the district court's impartiality because it ruled adversely to him. "But a district court judge's adverse rulings, without more, are not enough for a criminal defendant to demonstrate that the judge was biased against him." *State v. Mouelle*, 922 N.W.2d 706, 716 (Minn. 2019).

Smith's claim fails because he has not shown that the district court was biased. First, regarding bail, the district court clearly described the basis of—and provided sound reasons to justify—its decision. Second, Smith complains that because the court revoked his phone privileges in jail, he was placed in solitary confinement. But, as the district court explained in an order, it did not have authority to affect his housing assignment in jail and any grievances about that assignment should be directed to jail administrators. Finally, Smith accuses the district court of bias for denying his motion to dismiss the indictment. Even if Smith could show that the district court erred in its ruling, however, any error does not necessarily mean that the district court was biased.

In sum, the record shows that the district court took these issues under advisement and explained the rationale of its rulings. Some of the court's trial rulings favored Smith and some of them did not, but because these challenged adverse rulings are insufficient to show bias, Smith's claim fails.

II.

We turn now to the ineffective assistance of counsel claim asserted in Smith's pro se supplemental brief, which we review de novo. *State v. Blanche*, 696 N.W.2d 351, 376 (Minn. 2005). We use the two-prong test set out in *Strickland v. Washington*, 466 U.S. 668 (1984), to evaluate ineffective assistance of counsel claims. *See Leake v. State*, 737 N.W.2d 531, 536 (Minn. 2007). The appellant must prove that (1) counsel's performance "fell below an objective standard of reasonableness," and (2) but for counsel's error, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 688, 694. The appellant bears the burden of proof, and we "need not analyze both prongs if either one is determinative." *Leake v. State*, 767 N.W.2d 5, 10 (Minn. 2009).

Smith argues that he received ineffective assistance of trial counsel because his counsel did not move for a change in venue despite prejudice from local reporting on the case. To support his claim, he provides a selection of direct quotes from the "court of public opinion." Smith does not identify the source of these quotes, but he ostensibly claims that they are from local reporting on his case.

This claim fails because it does not satisfy either *Strickland* prong. These quotes do not demonstrate that counsel's performance "fell below an objective standard of reasonableness" under the first *Strickland* prong. Smith also fails to satisfy the second *Strickland* prong because he has not shown that if his counsel had moved for a change in venue, and the motion had been granted, the outcome of his trial would have been different.

This claim is similar to one addressed in *State v. Rhodes*. There, we concluded that a district court did not abuse its discretion when it denied an appellant's ineffective

17

assistance of counsel claim which was based, in part, on trial counsel's failure to move for a change of venue because of media coverage of the case. 627 N.W.2d 74, 86–87 (Minn. 2001). The appellant there also provided a sampling of reporting on his case, as well as an affidavit by his mother alleging that counsel admitted to her that he should have sought a change of venue, an affidavit from another attorney explaining that a change of venue was necessary, and the appellant's own affidavit stating that he had repeatedly asked his attorney to try to change venue. *Id.* at 82, 86. We explained that even if the appellant's allegations were true, his claims did not cast doubt on the fairness and impartiality of the jury because of how the district court conducted voir dire. *Id.* at 86–87. We reasoned that "the court and counsel at trial scrupulously examined prospective jurors concerning their awareness of pretrial publicity" and that jurors had only "minimal information" about the case before trial. *Id.* (internal quotation marks omitted).

As in *Rhodes*, our review of the trial transcript shows that the jury here was carefully examined by the district court and counsel. Although some members of the jury knew about the shooting before trial, none of them knew details beyond a basic outline of what happened as initially reported on the news. None of them claimed to have kept up with the case or to have learned anything specific about a suspect. Because Smith has not shown that his counsel acted unreasonably concerning a change of venue, or that, if his counsel had successfully moved to change venue, the outcome of his trial would have been different, his ineffective assistance of counsel claim fails.

III.

We next review Smith's argument that he is entitled to a new trial because he was denied a jury pool that reflects a fair cross-section of the community. Smith contends that Hennepin County's jury pool selection process is unconstitutional because Black persons are underrepresented on the source list from which the jury pools are generated. Because he fails to show that Black persons are underrepresented in either jury pool or that the alleged underrepresentation resulted from systematic exclusion, his fair cross-section claim fails.

"The United States and Minnesota Constitutions guarantee a criminal defendant the right to a jury pool that reflects a fair cross-section of the community."[6] *Anderson v. State*, 940 N.W.2d 172, 181 (Minn. 2020); *see Taylor v. Louisiana*, 419 U.S. 522, 530 (1975); *State v. Williams*, 525 N.W.2d 538, 542 (Minn. 1994). The Sixth Amendment, however, "does not guarantee a criminal defendant a [seated] jury of a particular composition or one that mirrors the community." *Williams*, 525 N.W.2d at 542 (citing *Taylor*, 419 U.S. at 538).

To make a prima facie showing that the jury pool selection process did not reflect a fair cross-section of the community, a criminal defendant must show: (1) the group allegedly excluded from the jury pool is a "distinctive" group in the community; (2) the

---

[6] A "jury pool" is the group of persons summoned for jury service and from among whom jurors will be chosen for a specific case. *Venire*, *Black's Law Dictionary* (12th ed. 2024). Although we use the term "jury pool" throughout this opinion, the terms "venire" and "jury panel" are used synonymously in our previous case law. *Id.*

19

group was not fairly represented in the jury pool selection process; and (3) the underrepresentation resulted from "systematic exclusion" of that group from the jury pool selection process. *Andersen*, 940 N.W.2d at 181–82 (citation omitted) (internal quotation marks omitted). To meet the third prong, *id.* at 82, a defendant must demonstrate that:

> [O]ver a significant period of time—[jury pool] after [jury pool], month after month—the group of eligible jurors in question has been significantly underrepresented on the [jury pools] and that this results from 'systematic exclusion, that is, unfair or inadequate [jury pool] selection procedures used by the state rather than, e.g., a higher percentage of 'no shows' on the part of people belonging to the group in question."

*Williams*, 525 N.W.2d at 543. We review a defendant's fair cross-section claim de novo. *See id.* at 541–44.

A fair cross-section claim fails if the defendant does not meet any one of the three prima facie conditions. *See Andersen*, 940 N.W.2d at 181–82 (rejecting a fair cross-section claim when the defendant "failed to provide any evidence to support his claim of systematic exclusion"). Smith argues that people who identify as Black represent a distinctive group that is underrepresented in the jury pools. He tries to demonstrate a prima facie case on the second and third prongs by contending that "[t]he fundamental problem" with Hennepin County's jury pool selection process "is that it relies on source lists that contain absolutely no race data" and that the State source list "underrepresents non-white people."[7]

---

[7] The Minnesota statewide source list is compiled from the Minnesota Department of Public Safety's database of licensed drivers and state identification cardholders and the Secretary of State's voter registration database. *See* Minn. Gen. R. Prac. 806(b).

He claims that it is "systematic exclusion" that the jury pool selection process has not changed despite these known issues.

The State vigorously defends the statewide system for creating the source list, noting that the system has been repeatedly upheld by this court. It states that the inclusivity[8] rate of Hennepin County's source list in 2022 was above the National Center for State Courts' best practices recommendation that the list "consist of unique name and address records for at least 85% of the total adult population within the jurisdiction." *See* Paula Hannaford-Agor et al., *Eliminating Shadows and Ghosts*, Nat'l Ctr. for St. Cts., Sept. 2022, at 1. The State warns against adding new source lists because any additional list must have sufficient content to perform a three-way crosscheck on a person's name, birthdate, and address; without an ability to conduct that crosscheck, the State asserts that the supplemented source list may then contain duplicates that could *exacerbate* any underrepresentation.[9] *See id.* at 11 (stating the risks of over-inclusiveness in source list supplementation).

---

[8]    "[I]nclusiveness" is a concept related to representativeness. "An inclusive master jury list is one that includes every citizen eligible for jury service within the geographic jurisdiction served by the court." Paula Hannaford-Agor et al., *Eliminating Shadows and Ghosts*, Nat'l Ctr. for St. Cts., Sept. 2022, at 1. Generally, "the more inclusive a jury list is, the more representative it is." *Id.*

[9]    The State further notes that the Legislature recently enacted a law that could positively affect representation in jury pools. Under Minnesota Statutes section 201.161, *as amended by*, Act of May 5, 2023, ch. 34, art. 1, § 9, 2023 Minn. Laws 316, 322–25, applications for a driver's license, identification card, MinnesotaCare, medical assistance, and benefits or services from participating state agencies, will result in automatic voter registration. The automatic inclusion of these recipients of public benefits on the voting list, which is one key source from which jurors are drawn, may improve

Smith's fair cross-section claim fails because he did not meet his burden on the second and third prongs—showing that Black persons were not fairly represented in the jury pool selection process or that the underrepresentation is the product of "systematic exclusion" or, put differently, "unfair or inadequate selection procedures" in the Hennepin County jury pool selection process. *Williams*, 525 N.W.2d at 543 (internal quotation marks omitted). Although he provided statistics and literature on the issue of jury underrepresentation to support his claim, this showing does not demonstrate a prima facie case for the following reasons.

Concerning the second prong, the statistical evidence that Smith cites fails to show that Black persons were not fairly represented in the jury pool selection process because the total count of the county's Black population is not an acceptable proxy for the *jury-eligible* population. To serve on a jury, a prospective juror must be a citizen, at least 18 years old, a resident of the county, able to communicate in English, capable of acting as a juror, have had their civil rights restored if they have been convicted of a felony, and not have served on a state or federal grand or petit jury in the past 4 years. Minn. Gen. R. Prac. 808(b).

In his motion to dismiss, Smith cited numbers showing that Black jurors comprised approximately 7.7 percent of the seated and alternate grand jurors assembled for the timeframe of his indictment, and he claimed at trial that 7.6 percent of the potential jurors

representation in jury pools. Kim Hyatt, *Voter Bill Offers One Way to Diversify Jury Pools: Automatic Sign-ups Could Add to Voter, Court Rolls.*, Star Trib., Feb. 19, 2023, at B1.

22

selected for voir dire identified as Black. Smith also alleged that, based on 2021 census data, 13.8 percent of Hennepin County residents identify as Black. But Smith has not established the percentage of Black persons in Hennepin County who are eligible to serve on a jury. Census data about the general population in Hennepin County does not account for the eligibility requirements for jury service. For instance, the record reveals nothing about the Black population of Hennepin County who are under 18, and therefore unable to serve as jurors.

Relatedly, the main affidavit that Smith relies on cites national data and data—some quite dated—from states other than Minnesota and requires us to infer that trends elsewhere occur in Hennepin County too. But we are not satisfied that the second prong may be met by an inference on the unsupported premise that trends in racial disparities elsewhere are present in Hennepin County. Without accurate data about the racial demographics of the jury-eligible population in Hennepin County, we cannot determine whether Black persons are underrepresented in the jury pool selection process.[10] Consequently, Smith has failed to meet his burden on the second prong.

Furthermore, even if we assume that the second prong has been met, Smith fails to make the required prima facie showing on the third prong because he has not demonstrated that "over a significant period of time—[jury pool] after [jury pool], month after month,"

---

[10]  We note that a defendant is not required to disprove all other plausible and alternative explanations for racial imbalance in a jury pool; instead, to make a prima facie fair cross-section claim, they must at least facially show the presence of underrepresentation and the lack of possible and alternative explanations for racial imbalance in a jury pool.

Black persons have been underrepresented in the jury pool. *Williams*, 525 N.W.2d at 543. In a dismissal motion based on the composition of the grand jury, Smith challenged the number of Black persons (approximately 7.7 percent) of the seated and alternate grand jurors assembled for the timeframe of his indictment.

Statistics from the Hennepin County Jury Office on the composition of seated and alternate grand jurors from 2017–2022 shows, however, that some seated grand jury panels had a *greater* percentage of Black grand jurors than the percentage of Black residents in the *general* population of Hennepin County. Hennepin County typically empanels three grand juries each year that meet for 4 months. Minn. State Court Adm'r's Office, *Minnesota State Jury Administration Plan* 5 (2021). Specifically, in 2017, one panel of seated and alternate grand jurors (i.e., one of the three grand jury panels convened that year) consisted of 15.2 percent Black persons, a greater percentage of Black persons than in the general census data provided by Smith.

Similarly, in 2018, a year in which four grand jury panels were convened, one panel consisted of 14.7 percent Black persons. And in 2019, a year in which three grand jury panels were convened, Black persons comprised 16.7 percent of one grand jury panel.[11] Considering this variation, Smith fails to show that "[jury pool] after [jury pool], month after month" Black persons were underrepresented in the grand jury pools. *Williams,* 525 N.W.2d at 543.

---

[11] During the 2020 pandemic, grand juries did not convene for a time. *See* Order Governing the Operations of the Minnesota Judicial Branch Under Emergency Executive Order Nos. 20-53, 20-56, No. ADM20-8001, Order at 3 (Minn. filed May 15, 2020).

Further, Smith's supporting documents cannot rule out the impact of alternative and plausible explanations for the existence of underrepresentation in the jury pool, such as failure to appear for jury duty, non-responsiveness to jury summons, hardship excusals, and disqualification from jury duty because of ineligibility. *See id.* at 543 (defining " 'systematic exclusion' " as "unfair or inadequate selection procedures used by the state *rather than*, *e.g.*, a higher percentage of 'no shows' on the part of people belonging to the group in question" (emphasis added)).

In fact, Smith's supporting documents specifically acknowledge the likely contribution of alternative causes to underrepresentation in jury pools. For example, "[n]onresponse and [failure to appear] rates contribute to underrepresentation of minorities in the jury pool" because "[u]ndeliverable, non-response/failure-to-appear . . . , and excusal rates are all strongly correlated with socioeconomic and minority status." William Caprathe et al., *Assessing and Achieving Jury Pool Representativeness*, 55 Judges' J. 16, 18–19 (2016).

The same report further explains that "excusals due to financial hardship, lack of transportation, and lack of child care have a disproportionate impact on minorities." *Id.* at 19. The hardship posed by jury duty is a substantial problem for many persons,[12] and it is

---

[12] We note that the Legislature can play a key role in helping to ensure that citizens of color are able to participate on juries. To make jury service more tenable for low- and middle-income citizens of all races and to lessen the need for excusal requests, the Minnesota Judicial Branch in 2024 asked the Legislature to increase the per diem payment from $20 a day to $100 a day to help offset lost wages, childcare, and related costs. A recent study evaluating a pilot program with a similar increase in juror per diem payments showed promising results in increasing the jury participation of citizens of color. *See* Michelle Lau & Anne Stuhldreher, *Be The Jury: Preliminary Findings from First*

25

another plausible and alternative explanation for any underrepresentation in Hennepin County's jury pool.

In addition, as discussed above, the source list for the jury pool (as well as the census data for Hennepin County) includes people who are not eligible to serve on juries. Because these ineligible persons include Black persons, disqualification from jury service is another likely explanation for any underrepresentation in the jury pool.

Ensuring that people of color serve as jurors is essential to the fair resolution of cases and to the public's trust in our legal system. Although we recognize the unquestionable importance of this issue, on the record before us Smith has not met his burden to show that Black persons were underrepresented in the jury pool selection process and that any underrepresentation is the product of "systematic exclusion." Accordingly, his fair cross-section claim fails.

IV.

Next, we consider Smith's challenge to the district court's admission of evidence of prior bad acts. The State moved to admit the evidence under the immediate episode exception or, alternatively, the *Spreigl* exception. The court admitted the evidence under the immediate episode exception without analyzing it under the rule announced in *Spreigl.* Smith contends that the evidence was not admissible under either exception.

---

*Six Months of Pilot Program*, Fin. Just. Project, Nov. 2022, at 1. The Legislature did not pass a funding increase in juror per diem in 2024. We urge the Legislature to pass legislation authorizing such an increase as soon as possible.

26

Minnesota courts generally exclude evidence of a defendant's prior bad acts. *See Spreigl*, 139 N.W.2d at 169; Minn R. Evid. 404(b) ("Evidence of another crime, wrong, or act is not admissible to prove the character of a person in order to show action in conformity therewith."). This established "exclusionary rule is grounded in the defendant's constitutional right to a fair trial." *State v. Ness*, 707 N.W.2d 676, 685 (Minn. 2006) (citing *Spreigl*, 139 N.W.2d at 171).

We review a district court's decision to admit evidence of a defendant's prior bad acts for an abuse of discretion. *State v. Riddley*, 776 N.W.2d 419, 424 (Minn. 2009) (concerning evidence admitted under the immediate episode exception); *State v. Smith* (*Smith II*), 940 N.W.2d 497, 503 (Minn. 2020)[13] (concerning evidence admitted under the *Spreigl* exception). "A district court abuses its discretion when its decision is based on an erroneous view of the law." *State v. Lopez*, 988 N.W.2d 107, 122 (Minn. 2023) (citation omitted) (internal quotation marks omitted). The defendant has the burden to show that the admission of the evidence was erroneous and prejudicial. *Riddley*, 776 N.W.2d at 424.

The immediate episode exception is a narrow exception to the general rule excluding evidence of prior bad acts. *Id.* at 425. "[I]mmediate episode evidence is admissible 'where two or more offenses are linked together in point of time or circumstances so that one cannot be fully shown without proving the other, or where evidence of other crimes constitutes part of the res gestae.' " *Id.* (quoting *State v. Wofford*, 114 N.W.2d 267, 271 (Minn. 1962)). Evidence of a prior bad act satisfies the immediate

---

[13]     The defendant in *Smith II*, 940 N.W.2d 497, is not related to the appellant.

episode exception if "there is a close causal and temporal connection between the prior bad act and the charged crime." *Id.*

In addition, under the *Spreigl* exception, evidence of prior bad acts may be admitted for limited purposes, including to show "motive, intent, knowledge, identity, absence of mistake or accident, or a common scheme or plan." *Ness*, 707 N.W.2d at 685. To admit evidence under this exception, the State must (1) provide notice of its intent to use the evidence; (2) clearly state what the evidence is being offered to prove; (3) present clear and convincing evidence that the defendant participated in the prior act; (4) establish that the evidence is relevant and material to the State's case; and (5) demonstrate that the probative value of the evidence is not outweighed by its potential prejudice to the defendant. *Smith II*, 940 N.W.2d at 503 (citation omitted) (internal quotation marks omitted); *State v. Burrell*, 772 N.W.2d 459, 465 (Minn. 2009).

We begin with the *Spreigl* exception. Smith only challenges the fourth and fifth factors of the *Spreigl* analysis here. Prior bad act evidence satisfies the fourth requirement of the *Spreigl* exception "when there is a sufficiently close relationship between the charged offense and the *Spreigl* offense in terms of time, place, or modus operandi." *State v. Gomez*, 721 N.W.2d 871, 878 (Minn. 2006). Evidence of prior bad acts may be relevant and material to show identity if identity is at issue. *State v. Wright*, 719 N.W.2d 910, 917 (Minn. 2006). As to the fifth requirement, we have explained that "prejudice does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the

28

evidence to persuade by illegitimate means." *State v. Cermak*, 365 N.W.2d 243, 247 n.2 (Minn. 1985) (citation omitted) (internal quotation marks omitted).

Smith challenges the admissibility of evidence of the following six prior bad acts: (1) the Wisconsin road rage episode; (2) possession of a .45-caliber pistol during the July 6 drive to Minnesota; (3) possession of a rifle during the July 6 drive to Minnesota before the shooting and in Minnesota after the shooting; (4) possession of a rifle when he was arrested; (5) possession of a .45-caliber pistol days after the shooting; and (6) possession of a .45-caliber bullet when he was arrested. Evidence of each prior bad act is analyzed in turn.

We first consider whether the challenged evidence of prior bad acts was relevant and material to the State's case, before evaluating whether its probative value is outweighed by its potential prejudice to Smith. Because we conclude that the challenged evidence was admissible under the *Spreigl* exception, or as direct or corroborative evidence of a charged crime, we do not consider its admissibility under the immediate episode exception.

A.

Smith challenges the relevance and materiality of evidence of the Wisconsin road rage episode that occurred just hours before Boughton was murdered. This evidence was relevant to prove the identity of the shooter, modus operandi, and knowledge. The key issue in this case was the identity of the shooter, and evidence of the Wisconsin road rage episode was directly relevant and material to that issue. In his trial testimony, the victim of the road rage episode recounted that the SUV driver had dreadlocks and was the first to

display a pistol out the driver's window. Smith was the only person in the Suburban with dreadlocks.

Evidence of the Wisconsin road rage episode is also relevant because it showed a similar modus operandi relevant to identity. Smith argues that this evidence was not admissible under *Spreigl* because it was not sufficiently similar to the charged offense (for example, in the Wisconsin incident no shots were fired, and *all three* guns were displayed) and the testimony does not connect Smith with the murder weapon. But under our precedent, evidence of the two driving episodes was sufficiently similar to be admissible under the *Spreigl* exception.

In *State v. Walsh*, we stated that evidence of the defendant's aggressive conduct toward a restaurant server hours before he committed a murder later that evening was "[a]rguably" admissible under the *Spreigl* exception. 495 N.W.2d 602, 604, 605–06 (Minn. 1993). The district court had concluded that the evidence—and that of a prior criminal offense—"showed a pattern of unprovoked physical aggression toward women; and because defendant denied he was the murderer, the two incidents were probative on the issues of defendant's identity and motive." *Id.* at 606. Similarly, the Wisconsin road rage incident occurred about 3½ hours before the highway shooting and was relevant because it showed Smith and other occupants of the Suburban reacting to minor traffic incidents by brandishing guns.

In addition, we agree with the State that evidence of the Wisconsin incident is also relevant because the State alternatively argued an accomplice liability theory, contending that even if Smith was not the principal shooter, he was an accomplice to the murder. This

30

evidence is relevant under the accomplice theory because it shows the close relationship among Smith, A.S., and B.S. *See State v. Nelson*, 632 N.W.2d 193, 197–98, 203–04 (Minn. 2001) (concluding that the district court did not abuse its discretion by admitting evidence of two robberies committed 4 to 5 months before the charged murder to show "the close relationship" and careful planning and execution of the crimes by the defendant and his accomplice). Smith's voluntary participation in the group's brandishing of guns is relevant to evaluate his contention that he did not participate in the shooting of Boughton hours later.

Smith also challenges the district court's admission of the Facebook video that Smith created around 3 p.m. on the drive from Chicago. In the video, Smith waves around a .45-caliber gun with an extended magazine—the same caliber gun as the murder weapon. This video was relevant to establish the identity of the shooter; it is relevant and material that Smith possessed a .45-caliber handgun in the Suburban just hours before a .45-caliber bullet was fired from the car he was driving, killing Boughton. The video is also relevant to show opportunity because it proves that Smith and the other Suburban occupants had access to guns, including a gun matching the caliber of gun that fired the bullet that killed Boughton.

In *State v. Smith* (*Smith I*), we affirmed the admission of evidence of a shooting involving the defendant that occurred "just hours before" the defendant killed the victim. 932 N.W.2d 257, 266–68 (Minn. 2019).[14] There, the victim of the prior shooting identified

---

[14]    The defendant in *Smith I*, 932 N.W.2d 257, is not related to the appellant.

31

the defendant as the person who shot him and described the weapon as a "chrome revolver." *Id.* at 266. We concluded that this evidence was relevant to the State's case under *Spreigl* because it "took place just hours before [the victim's] murder, in the same vicinity, and using a weapon consistent with the prosecution's theory." *Id.* at 267. Just as in *Smith I*, evidence of Smith's possession of the .45-caliber pistol with an extended magazine hours before the murder is relevant because it tends to identify Smith as the shooter, consistent with the prosecution's theory that Boughton was shot with a .45-caliber pistol.

Finally, Smith challenges the district court's admission of evidence of his possession of a rifle hours before the shooting during the drive to Minnesota, Smith's possession of a rifle in Minnesota later in the evening on the day of the shooting, and the discovery of a rifle in the Illinois apartment where Smith was staying when he was arrested. He further challenges the admission of evidence showing that 4 and 5 days after the shooting, Smith possessed a gun consistent with the .45-caliber pistol he handled in the Facebook video, as well as evidence of his possession of the .45-caliber bullet when arrested.

Because Smith was charged with being a prohibited person in possession of ammunition or a firearm, evidence of his possession of the rifle in Hennepin County on the night of the murder is direct evidence of that charge. Moreover, the additional evidence of Smith's control of the rifle during the road trip to Minnesota, a gun that he admitted at trial was one of the "shared guns" he allowed in his car, corroborated his girlfriend's direct testimony that he possessed the rifle on the night of the murder.

32

In addition, evidence of Smith's possession of a .45-caliber pistol consistent with the murder weapon only days after the shooting and a bullet of the same caliber that killed Boughton on the day of Smith's arrest, although attenuated in time, has some relevance in tending to identify Smith as the shooter. And even assuming that this evidence, and the evidence of Smith's possession of the rifle when arrested, was erroneously admitted, any error was harmless because it cannot be said to have "significantly affected the verdict" given that it was cumulative of other admissible evidence that tended to prove identity and illegal possession of a firearm. *See Smith II*, 940 N.W.2d at 503, 505–06 (declining to decide whether Facebook evidence was wrongly admitted because there was no reasonable possibility that any alleged error significantly affected the verdict given overwhelming evidence of defendant's guilt).

B.

Next, we consider whether the probative value of the evidence admissible under the *Spreigl* exception was outweighed by its potential for unfair prejudice. As mentioned above, we have explained that "prejudice does not mean the damage to the opponent's case that results from the legitimate probative force of the evidence; rather, it refers to the unfair advantage that results from the capacity of the evidence to persuade by illegitimate means." *Cermak*, 365 N.W.2d at 247 n.2 (citation omitted) (internal quotation marks omitted).

Smith argues that the evidence of prior bad acts was more prejudicial than probative because it suggested that he had a propensity to overreact in road rage incidents and to possess guns. We disagree. Smith primarily focuses his argument about prejudice on evidence of the earlier road rage incident. Evidence of the road rage incident in Wisconsin

33

was particularly probative because it stemmed from eyewitness testimony from a person who had been in a similar position to Boughton—a victim of threats with guns and road rage from Smith and the occupants of the Suburban—mere hours before the shooting. Additionally, evidence of Smith's handling of the murder weapon (or one like it) hours before the shooting is probative because it tends to prove that Smith used that weapon to kill Boughton. *See Wofford*, 114 N.W.2d at 272 ("There is no quarrel with the claim that prior possession of the gun or one similar to it had probative value as bearing upon the particular issues" underlying an appeal of a second-degree assault conviction). This evidence is not inadmissible "merely because it may indicate or have an 'incidental tendency' to implicate the defendant in unrelated offenses." *Id.* Evidence that Smith was handling a gun consistent with the murder weapon hours before the shooting is far more probative than unfairly prejudicial.

In sum, because the evidence of prior bad acts is admissible under the *Spreigl* exception or as direct or corroborative evidence of a charged crime, the district court did not abuse its discretion in admitting this evidence.

V.

Finally, we consider Smith's argument that the evidence was insufficient to support his conviction of first-degree intentional murder while committing a drive-by shooting because there is a reasonable inference that A.S. or B.S. shot Boughton. We disagree.

34

After considering the circumstances proved, and viewing them as a whole, we conclude that the only reasonable inference is that Smith shot Boughton.[15]

When an appellant challenges the sufficiency of the evidence, "we review the evidence to determine whether, given the facts in the record and the legitimate inferences that can be drawn from those facts, a jury could reasonably conclude that the defendant was guilty of the offense charged." *State v. Robertson*, 884 N.W.2d 864, 871 (Minn. 2016) (citation omitted) (internal quotation marks omitted). The evidence is viewed in the light most favorable to the verdict. *Id.* To convict Smith of first-degree intentional murder while committing a drive-by shooting, the State had to prove that Smith caused "the death of a human being with intent to effect the death of the person or another, while committing or attempting to commit . . . a drive-by shooting." Minn. Stat. § 609.185(a)(3).

We apply a two-step analysis to evaluate the sufficiency of circumstantial evidence. *State v. Ulrich*, 3 N.W.3d 1, 11 (Minn. 2024). First, we identify the circumstances proved by "winnow[ing] down the evidence presented at trial to a subset of facts that is consistent with the jury's verdict and disregard evidence that is inconsistent with the jury's verdict." *State v. Gilleylen*, 993 N.W.2d 266, 275 (Minn. 2023) (citation omitted) (internal quotation marks omitted). Second, we consider whether the reasonable inferences that can be drawn

---

[15]     Given our conclusion that the evidence is sufficient to show that Smith shot Boughton, we need not consider the State's alternative theory of accomplice liability. Even so, we note that because it was proved that Smith was the driver and paced Boughton's truck for over one-quarter of a mile before the bullet was fired, the only reasonable inference based on the circumstances proved is that even if Smith was not the principal, he helped to carry out the shooting.

from the circumstances proved, when viewed as a whole and not as discrete, isolated facts, "are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *State v. Hassan*, 977 N.W.2d 633, 640 (Minn. 2022).

We begin by ascertaining the circumstances proved, disregarding any evidence that conflicts with the jury's verdict. *State v. Segura*, 2 N.W.3d 142, 155 (Minn. 2024). Applying this standard, we conclude that the following key subset of facts proved are largely uncontested and include the following.

Video on Smith's cellphone shows him holding the .45-caliber pistol with an extended magazine, about 6 hours before the murder, during the drive from Chicago to Minnesota. No one else is captured on video in the Suburban wielding a .45-caliber Springfield Armory pistol on July 6. During the Wisconsin road rage incident, while driving, Smith was the first to display his gun at the driver. Shortly before the fatal shot was fired, Smith paced his car next to Boughton's truck for about one-quarter of a mile; as the driver, Smith had the ability to lower the front passenger window. Boughton was killed by a single .45-caliber bullet that came through his driver side window. Complete three-component gunshot residue particles were found on the Suburban's front passenger *interior door* and on *Smith's* black crossbody bag that he wore during the trip. Twenty two-component particles consistent with gunshot residue were found on the front passenger interior door; only one two-component particle was found on the rear passenger interior door. About 1 week after the murder, Smith texted A.S. and apologized for causing him harm. B.S.'s phone records show that he was texting about a minute before and after the shooting.

We next consider the reasonable inferences that may be drawn from the circumstances proved when viewed as a whole. *Segura*, 2 N.W.3d at 155. "The State's circumstantial evidence is sufficient when the reasonable inferences are consistent with the hypothesis that the accused is guilty and inconsistent with any rational hypothesis other than guilt." *Hassan*, 977 N.W.2d at 640. Smith focuses his sufficiency-of-the-evidence argument on what he considers a reasonable inference that A.S. or B.S. shot Boughton.[16]

When viewed as a whole, the circumstances proved support a reasonable inference that Smith shot Boughton and are inconsistent with a reasonable inference that A.S or B.S. shot Boughton. It is reasonable to infer that Smith lowered the front passenger window, extended his arm across A.S.'s chest, fired the fatal shot in response to another perceived traffic slight, and later apologized to A.S. for firing the shot out of the passenger window in such close range to A.S. The circumstances proved, when viewed as a whole, are inconsistent with a reasonable inference that A.S or B.S. shot Boughton. More specifically, the gunshot residue *inside* the car and on *Smith's* black crossbody bag is inconsistent with a reasonable inference that A.S. or B.S. fired the fatal shot because a passenger shooting at another car directly to their right would have extended their arm out of their car's window for better aim. Moreover, if the gun had been fired from the back seat, a higher concentration of gunshot residue would have been present on the interior rear passenger door. In addition, B.S.'s phone records are inconsistent with a reasonable inference that

---

[16] At trial, Smith contended only that B.S. shot Boughton and did not accuse A.S. of doing so.

37

B.S. fired the fatal shot because they show that he was texting only about a minute before and after the shooting. It is unreasonable to infer that—as a rear passenger who was actively texting—B.S. saw Boughton flip off the Suburban and became so enraged that he shot Boughton.

In sum, the only reasonable inference that can be drawn from the circumstances proved, when viewed as a whole, is that Smith shot Boughton. Accordingly, Smith is not entitled to a reversal of his conviction of first-degree intentional murder while committing a drive-by shooting.

*   *   *

Because Smith has failed to show that the district court was biased against him, defense counsel was ineffective, he was denied a fair cross-section of the community in his jury pool and that the alleged underrepresentation of Black persons in the jury pool was a result of "systematic exclusion," or that the evidence of prior bad acts was inadmissible, he is not entitled to a new trial. In addition, his conviction need not be reversed because the only reasonable inference that can be drawn from the circumstances proved, when viewed as a whole, is that Smith fired the fatal shot that killed Boughton.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of convictions.

Affirmed.


HENNESY, J., not having been a member of the court at the time of submission, took no part in the consideration or decision of this case.

38

CONCURRENCE

THISSEN, Justice (concurring).

I concur with the court's decision in this case and join Parts I, II, IV, and V of the court's opinion. I write separately on the question of whether appellant Jamal L. Smith is entitled to a new trial because he was denied a jury pool that reflects a fair cross-section of the community. I agree with the court that Smith did not satisfy his burden under the second step of the fair cross-section analysis to show that Black residents of Hennepin County were not fairly represented in the jury selection process. I would not reach the third step of the fair cross-section analysis.

In my opinion, the distinction we drew in *State v. Williams* between "unfair or inadequate selection procedures used by the state" and other reasons like "a higher percentage of 'no shows' on the part of people belonging to the group in question," 525 N.W.2d 538, 543 (Minn. 1994), is not as sharp as the *Williams* court portrayed it. If a larger percentage of eligible jurors in a certain group are not appearing for jury duty and there are reasonable steps the State can take to encourage that group of jurors to participate at higher rates—steps that research shows will increase participation—and the State fails to take such steps, that failure becomes systematic exclusion at some point.

An example is increasing juror per diems. For instance, a recent pilot program in San Francisco showed that increasing juror per diem from $15 per day to $100 per day for low- to moderate-income individuals resulted in removal of an economic barrier to participation on juries for low-income individuals and people of color compared to white

participants.  The Fin. Justice Project, *San Francisco Be The Jury Pilot Program Results* (Aug. 2023).  The State of Minnesota can only ignore such evidence for so long.

PROCACCINI, Justice (concurring).

I join parts I, II, IV, and V of the majority opinion and in the concurrence of Justice Thissen.