STATE OF MINNESOTA

IN SUPREME COURT

A22-1623
A24-1497

Dakota County                                                    Hudson, C.J.
                                                        Took no part, McKeig, J.
State of Minnesota,

                    Respondent,

vs.                                                    Filed: October 15, 2025
                                                        Office of Appellate Courts
Atravius Joseph Weeks,

                    Appellant.

_____

Keith Ellison, Attorney General, Saint Paul, Minnesota; and

Kathryn M. Keena, Dakota County Attorney, Cheri A. Townsend, Assistant Dakota County Attorney, Hastings, Minnesota, for respondent.

Cathryn Middlebrook, Chief Appellate Public Defender, Sara L. Martin, Assistant Public Defender, Saint Paul, Minnesota, for appellant.

_____

S Y L L A B U S

1.      The district court abused its discretion when it summarily denied appellant's postconviction petition because when the facts alleged in support of the petition are viewed in the light most favorable to appellant, the petition and the files and records of the proceeding do not conclusively show that appellant is entitled to no relief.

2.      The district court violated Minnesota Statutes section 609.04 (2024) when the court entered convictions on the offenses of first-degree domestic abuse murder and

1

second-degree intentional murder because the court entered a conviction on the greater offense of first-degree premeditated murder.

Reversed and remanded.

O P I N I O N

HUDSON, Chief Justice.

This first-degree murder appeal primarily concerns whether the Dakota County district court abused its discretion when it summarily denied appellant Atravius Weeks's postconviction petition, which asserted a violation of his constitutional right to a panel drawn from a jury pool that reflects a fair cross-section of the community.[1] In support of his petition, Weeks submitted an affidavit from an expert who opined that obtaining race data relevant to a claim that the jury source list used to summon pools of prospective jurors systematically excludes Black people "is difficult." Based on the data he was able to obtain, the expert posited that racial disparities in voter registration and driver's licenses were among the factors causing an imbalance in the overall racial composition of the jury pools from which panels are drawn in Dakota County. The district court summarily denied

---

[1] The "jury source list" is "used for the random selection . . . of prospective jurors," and "[t]he voter registration list and the driver's license and ID cardholders list must serve as the basis for the jury source list." Minn. Gen. R. Prac. 806(b)–(c). A "jury pool" is a group of persons summoned to the courthouse for jury service and from which jurors will be chosen for a specific case. *See Venire*, *Black's Law Dictionary* (12th ed. 2024). A "panel" is a group of prospective jurors who are drawn from the jury pool and sent to the courtroom for voir dire. *See State v. Lee*, 491 N.W.2d 895, 898 (Minn. 1992) (describing the jury empanelment process). A "seated juror" is a prospective juror on the panel who is selected to hear the case following voir dire. *See State v. Blom*, 682 N.W.2d 578, 608–09 (Minn. 2004) (describing the voir dire and juror selection process).

the postconviction petition, concluding that the facts alleged in support of the petition failed to show that the underrepresentation of Black jurors was the result of systematic exclusion.[2]

On appeal to this court, Weeks makes two primary claims. First, he claims that the district court abused its discretion by summarily denying his postconviction petition. Weeks argues that the facts alleged in support of the petition establish that he was deprived of his constitutional right to a panel drawn from a jury pool that reflects a fair cross-section of the community,[3] and that the underrepresentation of Black jurors in the jury pool from which his panel was drawn was the result of systematic exclusion. As part of his argument, Weeks contends that it "is impossible" to establish a lack of alternative explanations for racial imbalance in a jury pool. Second, Weeks claims that the district court violated Minnesota Statutes section 609.04 (2024) when it entered convictions on the offenses of first-degree domestic abuse murder and second-degree intentional murder because the court entered a conviction on the greater offense of first-degree premeditated murder. Although the State contests the first claim, it concedes that the district court violated section 609.04.

---

[2]    Weeks made a similar "fair cross-section" claim at trial, which the district court denied in part because Weeks lacked an expert affidavit. On appeal, Weeks's arguments focus on the district court's denial of his postconviction petition because the postconviction record includes an expert affidavit.

[3]    Weeks did not challenge the grand jury selection process in his postconviction petition. On appeal to this court, Weeks claims, for the first time, that he was deprived of his constitutional right to a grand jury that represented a fair cross-section of the community. Weeks has forfeited appellate review of his grand jury argument because he failed to raise it in his postconviction petition. *See Schleicher v. State*, 718 N.W.2d 440, 445 (Minn. 2006) (noting that issues not raised in a petition for postconviction relief cannot be raised on appeal).

We conclude that the district court abused its discretion when it summarily denied Weeks's postconviction petition because, when the facts alleged in support of the petition are viewed in the light most favorable to Weeks, the petition and the files and records of the proceeding do not conclusively show that Weeks is entitled to no relief. Among the disputed questions of material fact is whether it is reasonably possible to establish through independent studies or other government sources that Black persons were not fairly represented in the jury pool process and that the racial imbalance in the jury pool is not the result of alternative explanations, like hardship excusals and failures to respond to jury summons. We also conclude that the district court violated Minnesota Statutes section 609.04 when it entered convictions on the offenses of first-degree domestic abuse murder and second-degree intentional murder because the court entered a conviction on the greater offense of first-degree premeditated murder. We therefore reverse the district court's decision to summarily deny the postconviction petition and remand to the district court for a postconviction evidentiary hearing and to vacate the first-degree domestic abuse murder and second-degree intentional murder convictions.

**FACTS**

At around 1:15 a.m. on June 22, 2021, officers responded to a 911 call from a woman who reported that appellant Atravius Weeks was attempting to enter her building in Belle Plaine and had also sent her a message saying he had shot himself. When the officers arrived, they located Weeks, who was bleeding and holding a firearm, which he agreed to drop upon request. While the officers were treating Weeks's wound and waiting for medics to arrive, Weeks said, "I just killed my best friend." Weeks told the officers

4

that the victim, Cortney Henry, was outside of a daycare facility in Lakeville, and that he had shot her seven times. According to the 911 caller, Weeks and Henry had broken up a few days earlier, on June 16, 2021. Officers were dispatched to the Lakeville daycare facility where they found Henry's body.

A Dakota County grand jury indicted Weeks for one count of first-degree premeditated murder under Minnesota Statutes section 609.185(a)(1) (2024), one count of first-degree domestic abuse murder under section 609.185(a)(6) (2024), and one count of second-degree intentional murder under section 609.19, subdivision 1(1) (2024). Weeks pleaded not guilty and demanded a jury trial.

Before trial, the Dakota County Jury Commissioner used the jury source list to summon a pool of prospective jurors, in accordance with Jury Management Rule 806.[4] Minn. Gen. R. Prac. 806. The jury source list was composed of the voter registration and driver's license lists. *See* Minn. Gen. R. Prac. 806(b) (2022) ("The voter registration and drivers' license list for the county must serve as the source list."); Minn. Gen. R. Prac.

---

[4] The record contains a letter from the Minnesota Attorney General's Office that states, "The judicial branch contracts with Jury Systems Inc (JSI) for the secure, web-based system Minnesota uses to create the Jury Source List, store juror information, randomly select jurors for summoning, and track juror activity and utilization through each step of the process (WebGen)." According to the letter, to identify accurate addresses for potential jurors in June 2022, the software program used to create the jury source list merges voter registration and driver's license/state identification lists and then checks the list against the Department of Health's list of deceased persons. The Dakota County Jury Commissioner does not have control over the jury source list. *See* Minn. Gen. R. Prac. 803 advisory comm. cmt.—2007 amendment. In June 2022, the Dakota County Jury Commissioner had the authority *to supplement* the source list with names from other lists specified in the local jury administration plan, Minn. Gen. R. Prac. 806(b) (2022), but in 2023 that authority was transferred to the statewide Judicial Council, Minn. Gen. R. Prac. 806(b) (2024).

802(d), (e) (2022) (defining "voter registration list" and "drivers' license list"). On June 27, 2022, a panel of 60 prospective jurors was drawn from the summoned pool. The panel went to the courtroom for the parties to conduct voir dire. When Weeks observed that only one of the panel members was Black, he asked the district court to request a new panel, arguing that the current panel violated his constitutional right to a panel drawn from a jury pool that reflects a fair cross-section of the community because it grossly underrepresented Black people. More specifically, he argued that while the 2020 Census showed that Dakota County is 7.5 percent Black, which would be equivalent to 4.5 people out of 60, the one panel member who identified as Black represented only 1.6 percent of the 60 prospective jurors selected for voir dire.[5]

The district court analyzed Weeks's request under the three-prong test announced in *State v. Williams*, 525 N.W.2d 538, 542 (Minn. 1994). In *Williams*, we held that to establish a violation of the constitutional right to a panel drawn from a jury pool that reflects a fair cross-section of the community, a defendant must show that (1) "the group allegedly excluded is a 'distinctive' group in the community," (2) "the group in question was not fairly represented in the venire," and (3) "the underrepresentation was the result of a

---

[5] Of the 60 original prospective jurors on the panel, around 20 were dismissed due to COVID exposure. The court then requested 20 additional prospective jurors, two of whom identified as Black or African American. Consequently, 3.75 percent of the 80 prospective jurors drawn from the pool identified as Black or African American. And after the 20 prospective jurors were dismissed due to COVID exposure, five percent of the new pool of 60 identified as Black or African American. The district court's postconviction order did not specify which comparison it relied upon in determining that Black people were not fairly represented in the venire. This should be clarified by the district court on remand in its analysis of this factor at the evidentiary hearing.

'systematic' exclusion of the group in question from the jury selection process." *Id.* at 542. In this context, "systematic exclusion" means "unfair or inadequate selection procedures used by the [S]tate rather than, *e.g.*, a higher percentage of 'no shows' on the part of people belonging to the group in question." *Id.* at 543 (quoting *Duren v. Missouri*, 439 U.S. 357, 364–67 (1979)); *see also Berghuis v. Smith*, 559 U.S. 314, 332–33 (2010) (clarifying that the United States Supreme Court has never held that a defendant can make out a prima facie case for a fair cross-section violation by merely pointing to a host of factors that, individually or in combination, might contribute to a group's underrepresentation). The district court denied Weeks's request, concluding that it failed under the third prong of the *Williams* test because Weeks had not shown that the underrepresentation of Black people on the panel was the result of systematic exclusion of Black people from the jury pool. The trial proceeded, the jury ultimately found Weeks guilty of all three murder counts, and the court entered convictions on all three counts, sentencing Weeks to life imprisonment without the possibility of release. Weeks filed a direct appeal, which was stayed to allow him to pursue postconviction relief. Weeks then filed his petition for postconviction relief.

In his postconviction petition, Weeks claimed that he was deprived of his constitutional right to a panel drawn from a jury pool that reflected a fair cross-section of the community because Black jurors were systematically excluded from the jury pool. In support of his petition, Weeks submitted an affidavit from Professor David Schultz, a professor of political science and legal studies, with an attached report by Dr. Gary Oehlert, a retired professor of applied statistics.

7

In this affidavit, Professor Schultz alleged that it "is difficult" to obtain race data that is relevant to a defendant's claim that a jury source list used to summon pools of prospective jurors systematically excludes Black people, in part due to privacy laws. Based on the information he obtained, Professor Schultz opined that "[w]hile at one time the use of voter registration lists and driver's licenses may have formed the basis of a fair and racially equitable jury pool, they no longer do so." According to Professor Schultz there is now "a clear racial disparity in voter registration," and that "[i]f jury [pool] selection is based simply on voter registration it would likely fail to produce a jury pool that [is] racially representative of the adult Minnesota population." He noted that there are likely similar disparities when it comes to driver's licenses.

Professor Schultz inferred that the racial disparities he observes at a national or state level likely exist in Dakota County as well.[6] In calculating the number of eligible jurors in Dakota County, Professor Schultz relied on census data for Dakota County. Because the census data grouped fifteen- to nineteen-year-olds together and because "one cannot easily separate eighteen- and nineteen-year-olds from this data," Professor Schultz did not include eighteen- and nineteen-year-olds in his calculation of eligible jurors. Ultimately, he concluded that "[t]he initial selection of jury pools based on voter registration and possession of a driver's license in Dakota County systemically underrepresents persons of

---

[6]     Professor Schultz alleged that "[c]ounty-level data on race, voter registration, and possession of a driver's license is not available." Based on that allegation, he explained that as a research scholar, it is "an appropriate methodology to use the best available statistics and make some reasonable inferences and draw upon other studies to make some inferences regarding racial disparities in jury pool selection and composition at the county-level."

color and that impacts underrepresentation of persons of color available for voir dire and to be sworn in on juries." He further concluded that "[t]his underrepresentation in Dakota County has more likely than not taken place for several years, perhaps as early as 2010 and continues to this day."

The attachment by Dr. Oehlert adds that "[w]hite/Caucasian residents are over-represented in Dakota County juries by an amount that is not easily dismissed as random sampling variation," and that "the probability of getting as many white/Caucasian residents (or more) in the *voir dire* pool is . . . less than the probability of hitting the Powerball jackpot on five consecutive weeks."

In response to Weeks's petition, the State submitted an affidavit from Dakota County Jury Commissioner Maria King. King explained that her office follows the Minnesota Supreme Court Jury Management Rules and the Minnesota Judicial Branch's Jury Administration Plan. At the time of Weeks's trial, her office was sending 300 jury summons every two weeks. King further explained that although privacy laws protect access to the names and dates of birth of persons who receive jury summons, Minnesota General Rule of Practice 814 allows a court to order disclosure of such information.[7]

---

[7] Minnesota General Rule of Practice 814, which was updated effective November 22, 2023 along with the other Jury Management Rules to conform with current practice, provides that in the interest of justice, a court may authorize access to information on persons who were summoned for jury service, when the data and reports can be readily generated from the court's records or jury management system, except that information provided by a prospective juror regarding medical, financial, or other personal hardship information for purposes of determining the person's ability to serve on a jury may not be disclosed. *See* Order Promulgating Amendments to the Minnesota General Rules of Practice for the District Courts, No. ADM09-8009, Order at 4 (Minn. filed Aug. 24, 2023).

The district court summarily denied Weeks's postconviction petition. The court concluded that Weeks had satisfied the first two prongs of the *Williams* test but had failed to satisfy the third prong. The court said that Weeks had satisfied the first prong because "persons 'self-identifying as [B]lack are a distinctive group in the community.' " (Quoting *State v. Griffin*, 846 N.W.2d 93, 99 (Minn. App. 2014).) The court said that Weeks had satisfied the second prong because "the group in question was not fairly represented" in the panel of jurors drawn from the pool on June 27, 2022. However, the court said that Weeks had failed the third prong because he "failed to demonstrate that the process for summoning prospective jurors 'systematically' excludes a distinctive racial group." (Quoting *Williams*, 525 N.W.2d at 542.)

To support this conclusion, the district court cited our decision in *Andersen v. State*, 940 N.W.2d 172, 182 (Minn. 2020), which determined that a jury selection system that uses registered voters, driver's licenses, and registered Minnesota identification card holders does not systematically exclude people of color. The district court cited *Andersen* and other Minnesota cases that reached the same conclusion, including *State v. Roan*, 532 N.W.2d 563, 569 (Minn. 1995) and *Griffin*, 846 N.W.2d at 102, stating, "[t]he juror-selection process that Dakota County relied on in Weeks's case is the same juror-selection process that Minnesota Courts have routinely held does not systematically exclude people of color." Because it concluded that the facts alleged in Weeks's postconviction petition

---

According to the Dakota County Jury Commissioner, the Minnesota Office of the Secretary of State and the Minnesota Department of Public Safety's Division of Driver and Vehicle Services provide her office with the names and dates of birth of potential jurors. Neither of these state offices collects race data.

failed, as a matter of law, to establish a prima facie case that the underrepresentation of Black jurors in the panel drawn from the jury pool was a result of systematic exclusion, the district court summarily denied the petition without an evidentiary hearing.

Weeks then appealed to this court.

**ANALYSIS**

We first address whether the district court abused its discretion by summarily denying Weeks's postconviction petition, which alleged that he was deprived of a panel drawn from a jury pool that reflected a fair cross-section of the community. We then address whether the district court violated Minnesota Statutes section 609.04 by entering convictions on the offenses of first-degree domestic abuse murder and second-degree intentional murder.

I.

We review the summary denial of a postconviction petition for an abuse of discretion. *Munt v. State*, 984 N.W.2d 242, 249 (Minn. 2023). A district court "abuses its discretion when its decision is based on an erroneous view of the law or is against logic and the facts in the record," or when the court "exercises its discretion in an arbitrary or capricious manner." *Crow v. State*, 923 N.W.2d 2, 9 (Minn. 2019) (citation omitted) (internal quotation marks omitted).

A person may petition for postconviction relief if a conviction violates their constitutional or statutory rights. Minn. Stat. § 590.01, subd. 1(1) (2024). The allegations in the petition "must be more than argumentative assertions without factual support." *Thoresen v. State*, 965 N.W.2d 295, 303 (Minn. 2021) (citation omitted) (internal quotation

11

marks omitted). "The person seeking postconviction relief bears the burden of establishing by a preponderance of the evidence that his claims merit relief." *Crow*, 923 N.W.2d at 10.

"Unless the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief," the district court must hold an evidentiary hearing to determine whether the facts alleged in the petition have been proven by a preponderance of the evidence. Minn. Stat. § 590.04 (2024); *State v. King*, 990 N.W.2d 406, 418 (Minn. 2023). "Although doubts about whether to conduct an evidentiary hearing are resolved in favor of the petitioner," a district court may summarily deny the petition without holding an evidentiary hearing when "the petitioner alleges facts that, if true, are legally insufficient to grant the requested relief." *State v. Sardina-Padilla*, 7 N.W.3d 585, 602–03 (Minn. 2024) (citation omitted) (internal quotation marks omitted). Put differently, "[i]f, taking the facts alleged in the light most favorable to the petitioner, the petition and the files and records of the proceeding conclusively show that the petitioner is entitled to no relief, the [district] court may dismiss the petition without an evidentiary hearing." *Ezeka v. State*, 16 N.W.3d 768, 776 (Minn. 2025) (citation omitted) (internal quotation marks omitted).

Here, Weeks's substantive claim is that he was denied his constitutional right to a panel drawn from a jury pool that reflects a fair cross-section of the community. Therefore, the question before us is whether the district court abused its discretion when it determined that even if the facts alleged in support of Weeks's constitutional claim, including Professor Shultz's affidavit and the attached report by Gary Oehlert, were viewed in the light most favorable to Weeks, the petition and the files and records of the proceeding conclusively showed he was entitled to no relief.

12

A criminal defendant has a constitutional right to a panel drawn from a jury pool that reflects a fair cross-section of the community. *Taylor v. Louisiana*, 419 U.S. 522, 530 (1975); *Hennepin County v. Perry*, 561 N.W.2d 889, 895 (Minn. 1997). Still, the Sixth Amendment "does not guarantee a criminal defendant a seated jury of a particular composition or one that mirrors the community." *State v. Smith*, 9 N.W.3d 543, 557 (Minn. 2024) (citation modified). To make a prima facie showing that the panel drawn from the jury pool did not satisfy the fair cross-section requirement, a criminal defendant must show that (1) "the group allegedly excluded is a 'distinctive' group in the community," (2) "the group in question was not fairly represented in the venire," and (3) "the underrepresentation was the result of a 'systematic' exclusion of the group in question from the jury selection process" where "systematic exclusion" means "unfair or inadequate selection procedures used by the state rather than, *e.g.*, a higher percentage of 'no shows' on the part of people belonging to the group in question." *Williams*, 525 N.W.2d at 542–43 (quoting *Duren v. Missouri*, 439 U.S. 357, 364–67 (1979)). To meet the third prong, a defendant must demonstrate that,

> over a significant period of time—jury pool after jury pool, month after month—the group of eligible jurors in question has been significantly underrepresented on the jury pools and that this results from systematic exclusion, that is, unfair or inadequate jury pool selection procedures used by the state rather than, e.g., a higher percentage of no shows on the part of people belonging to the group in question.

*Smith*, 9 N.W.3d at 557 (citation modified).

Here, the district court concluded that when viewed in the light most favorable to Weeks, the facts alleged in support of the postconviction petition established the first and

13

second prongs of the test announced in *Williams*,[8] but they did not establish the third prong because in *Andersen*, 940 N.W.2d at 182, we determined that a jury selection system that uses registered voters, driver's licenses, and registered Minnesota identification card holders does not systematically exclude people of color.

On appeal, Weeks argues that the district court abused its discretion by summarily denying his postconviction petition because it failed to view the facts alleged in his petition in the light most favorable to him when it considered the systematic exclusion prong of the *Williams* test.[9] According to Weeks, if he proves all the material facts alleged in support

---

[8] Although the State concedes that when the facts alleged in support of the petition are viewed in the light most favorable to Weeks, they establish the first prong of the *Williams* test, the State argues that they fail to establish the second prong because Professor Schultz's affidavit fails to calculate the number of Black people who are *eligible* to serve on juries. In *Smith*, where the movant relied upon "[c]ensus data about the general population in Hennepin County," we concluded that the second prong was not met because "the total count of the county's Black population is not an acceptable proxy for the *jury-eligible* population." *Smith*, 9 N.W.3d at 558. Here, Professor Schultz has done more with the census data than in *Smith*, excluding for example, the census data that grouped fifteen-to-nineteen-year-olds together. But whether Professor Schultz has adequately provided "accurate data about the racial demographics of the jury-eligible population in [Dakota] County," *see id.* at 559, presents a genuine issue of material fact, including as to whether such a calculation could be made based on data that can reasonably be obtained by researchers like Professor Schultz through independent studies or other government sources. If Weeks were to prove by a preponderance of the evidence that it is not reasonably possible to calculate the number of eligible Black jurors through independent studies or other government sources, we may need to revisit *Smith*, 9 N.W.3d at 558–59, to the extent that *Smith* can be viewed as concluding that the second prong can never be met when the criminal defendant has failed to account for all eligibility criteria and thus "has not established the percentage of Black persons in [the] County who are eligible to serve on a jury."

[9] Weeks also contends that he is entitled to a new trial as a matter of law because none of the material facts are disputed. But, as we explain below and have explained above, *supra* note 8, we conclude that some of the material facts are disputed and therefore the

14

of his postconviction petition by a preponderance of the evidence at a postconviction evidentiary hearing, the three-prong *Williams* test will be satisfied and he will be entitled to a new trial. We agree.

In concluding that Weeks failed to satisfy the systematic exclusion prong of the *Williams* test, the district court abused its discretion in two respects. First, it failed to view the facts alleged in support of the postconviction petition in the light most favorable to Weeks, including Professor Schultz's allegation that "[w]hile at one time the use of voter registration lists and driver's licenses may have formed a basis of a fair and racially equitable jury pool, they no longer do so." Second, the court misinterpreted our decision in *Andersen*, 940 N.W.2d at 182.

*Andersen* does not declare—as the district court suggests—that a jury selection process that uses only registered voter lists and driver's license lists can never systematically exclude people of color. Rather, *Andersen* says only that the defendant in that case failed to make a prima facie case because he failed to provide any evidence to support the third prong of the *Williams* test. The defendant in *Andersen* "adduced no historical or contemporaneous evidence or statistical analysis to factually support his argument that the jury selection as conducted in Becker County in 2008 systematically excluded White Earth Band members—or Native Americans more generally." *Id.* It was "[b]ecause Andersen failed to provide any evidence to support his claim of systematic

---

appropriate remedy is a postconviction evidentiary hearing that allows the district court to assess the credibility of witnesses and make factual findings regarding the disputed facts, not a new trial.

15

exclusion" that we could not conclude that the Becker County juror selection system violated his right to a fair trial. *Id.*

Weeks, by contrast, provided the affidavit from Professor Schultz, which alleged among other things that "[w]hile at one time the use of voter registration lists and driver's licenses may have formed a basis of a fair and racially equitable jury pool, they no longer do so." Professor Schultz also alleged that obtaining race data relevant to a claim that the jury source list used to summon pools of prospective jurors systematically excludes Black people "is difficult," in part due to privacy laws.[10] Not only did the district court fail to view this allegation, as well as the other facts alleged to establish the third *Williams* prong,

---

[10] The defendant in *Smith*, 9 N.W.3d at 557, argued that the Hennepin County Jury Office used inadequate data that contained no information on race, which rendered it impossible for *the judicial branch* to review the sufficiency of jury pools. Weeks, by contrast, argues that it is impossible for *him* to establish that the alleged underrepresentation of Black persons from Dakota County jury pools is the result of unfair or inadequate jury pool selection procedures used by the state rather than, e.g., a higher percentage of no shows on the part of people belonging to the group in question. In support of Weeks's argument, Professor Schultz alleged that it "is difficult" to obtain the required data in part due to privacy laws. In contrast, the Dakota County Jury Commissioner alleged that although privacy laws protect access to the names and dates of birth of persons who receive jury summons, Minnesota General Rule of Practice 814 allows a court to order disclosure of such information. If Weeks were to prove by a preponderance of the evidence that it is not reasonably possible to establish through independent studies or other government sources that the alleged underrepresentation of Black persons from Dakota County jury pools month after month is not the result of alternative explanations, like hardship excusals and failures to respond to jury summons, we would need to revisit the breadth of our conclusion in *Smith*, 9 N.W.3d at 559–60 (stating that a defendant must "rule out the impact of alternative and plausible explanations for the existence of underrepresentation in the jury pool, such as failure to appear for jury duty, non-responsiveness to jury summons, hardship excusals, and disqualification from jury duty because of ineligibility").

16

in the light most favorable to Weeks, it failed to acknowledge much less discuss any of the alleged facts in its order denying postconviction relief.

Because the district court's decision to summarily deny Weeks's postconviction petition was based on an erroneous view of the law and the facts alleged in the record, we conclude that the court abused its discretion. A remand for a postconviction evidentiary hearing is required because the facts alleged in support of Weeks's postconviction petition raise genuine issues of material fact as to the second and third prongs, including but not limited to (1) whether voter registration lists and driver's licenses currently form a basis for a fair and racially equitable jury pool, (2) whether it is reasonably possible to calculate the number of eligible Black jurors in Dakota County through independent studies or other government sources, and (3) whether it is reasonably possible to establish through independent studies or other government sources that the alleged underrepresentation of Black persons from Dakota County jury pools is not the result of alternative explanations like failures to appear for jury duty and hardship excusals.[11]

---

[11] The district court, having concluded that Weeks failed to make a prima facie showing that his constitutional right to a panel drawn from a jury pool that reflects a fair cross-section of the community was violated, did not consider whether the State could rebut such a showing by establishing that the system that was used "manifestly and primarily advances a significant state interest that is incompatible with the fair cross-section requirement." *Williams*, 525 N.W.2d at 542. On remand, the State may present evidence at the postconviction evidentiary hearing on the issue of whether Dakota County's jury-selection system manifestly and primarily advances a significant state interest that is incompatible with the fair cross-section requirement.

## II.

We now consider whether the district court violated Minnesota Statutes section 609.04 by entering convictions on the offenses of first-degree domestic abuse murder and second-degree intentional murder because the court entered a conviction on the greater offense of first-degree premeditated murder. We conclude that the district court did violate section 609.04, and we remand to the district court to vacate Weeks's convictions for first-degree domestic abuse murder and second-degree intentional murder.

Both parties agree that the district court committed reversible error when it violated Minnesota Statutes section 609.04, subdivision 1 (providing that a defendant "may be convicted of either the crime charged or an included offense, but not both") by entering convictions for first-degree domestic abuse murder and second-degree intentional murder offenses because the court entered a conviction on the greater offense of first-degree premeditated murder.

In *State v. Balandin*, 944 N.W.2d 204, 221–22 (Minn. 2020), we concluded that the district court erred by convicting the defendant of first-degree domestic abuse murder and second-degree intentional murder, in addition to first-degree premeditated murder. *Balandin* cited Minnesota Statutes section 609.04, subdivision 1, which provides that a defendant "may be convicted of either the crime charged or an included offense, but not both." Citing our precedent, *Balandin* also affirmed that, under section 609.04, "a defendant may not legally be convicted of two counts of first-degree murder when both convictions are for the same offense, are on the basis of the same act, and involve the same victim." *Id.* at 222 (citation omitted) (internal quotation marks omitted). We also

18

recognized that "every lesser degree of murder is an included offense." *Id.* (citation omitted) (internal quotation marks omitted).

Like the defendant in *Balandin*, Weeks was convicted of first-degree domestic abuse murder and second-degree intentional murder in addition to first-degree premeditated murder. For the same reasons as in *Balandin*, we remand to the district court to vacate Weeks's convictions for first-degree domestic abuse murder and second-degree intentional murder.

## CONCLUSION

For the foregoing reasons, we reverse the decision of the district court and remand for a postconviction evidentiary hearing and a vacation of Weeks's convictions for first-degree domestic abuse murder and second-degree intentional murder.

Reversed and remanded.


MCKEIG, J., took no part in the consideration or decision of this case.